# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

MICHAEL SEVY, on behalf of himself and all others similarly situated,

Plaintiff,

v.

TYSON FOODS, INC.; TYSON FRESH MEATS, INC.; JBS S.A.; JBS USA FOOD COMPANY; SWIFT BEEF COMPANY; JBS PACKERLAND, INC.; CARGILL, INCORPORATED; CARGILL MEAT SOLUTIONS CORPORATION; MARFRIG GLOBAL FOODS S.A.; NATIONAL BEEF PACKING COMPANY, LLC; and JOHN DOES 1-10;

Defendants.

Case No. 0:19-cv-1243

**CLASS ACTION COMPLAINT**

Jury Trial Demanded

908551.1

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     PARTIES .............................................................................................................. 7

        A.      Plaintiff ..................................................................................................... 7

        B.      The Tyson Defendants .............................................................................. 7

        C.      The JBS Defendants .................................................................................. 8

        D.      The Cargill Defendants ............................................................................ 9

        E.      The National Beef Defendants ................................................................. 9

        F.      Packing Defendants ................................................................................ 10

        G.      John Doe Defendants .............................................................................. 11

        H.      Agents and Affiliates .............................................................................. 11

III.    JURISDICTION, VENUE AND COMMERCE ............................................. 12

IV.     OVERVIEW OF THE FED CATTLE MARKET ......................................... 14

V.      PACKING DEFENDANTS CONSPIRED TO DEPRESS FED
        CATTLE PRICES .............................................................................................. 22

        A.      Packing Defendants Agreed to Slash Cash Cattle Purchases During
                Slaughter Reductions ............................................................................. 23

        B.      Packing Defendants Coordinated their Procurement Practices for
                Cash Cattle ............................................................................................. 25

        C.      Packing Defendants Uneconomically Imported Foreign Live Cattle to
                Depress Demand for U.S. Fed Cattle ..................................................... 29

        D.      Packing Defendants Agreed to Refrain from Expanding Their
                Slaughtering Capacity ............................................................................ 30

VI.     PACKING DEFENDANTS' CONSPIRACY CAUSED THE 2015
        PRICE COLLAPSE AND SUPPRESSED PRICES THEREAFTER ........... 31

        A.      Packing Defendants' Conduct Precipitated the Collapse in Fed Cattle
                Prices in 2015 ......................................................................................... 31

B.    Packing Defendants' Ongoing Conduct Continues to Depress
Fed Cattle Prices.........................................................................34

C.    Packing Defendants Publicly Affirmed Their Commitment to
Supply Restraint ..........................................................................37

D.    Other Explanations Proffered for the Drop in Fed Cattle Prices
Do Not Withstand Scrutiny ..........................................................39

VII.   **THE FED CATTLE MARKET IS CONDUCIVE TO COLLUSION............40**

A.    The Fed Cattle Packing Industry Has Experienced High Consolidation
and Is Highly Concentrated ..........................................................41

B.    The Supply of Fed Cattle and Demand for Beef Are Relatively
Insensitive to Short-Term Changes in Price.................................41

C.    Fed Cattle Producers Face Significant Market Access Risk ........42

D.    There Are Numerous Trade Organizations and Opportunities for
Packing Defendants to Meet and Collude ....................................44

E.    Packing Defendants Benefit from High Barriers to Entry ...........45

F.    Packing Defendants Have Similar Cost Structures and Have
Significant Oversight of Each Other's Price and Production Decisions.....47

VIII.  **PACKING DEFENDANTS ARE RECIDIVISTS WITH A HISTORY
OF COLLUSION...........................................................................48**

IX.    **MANIPULATION OF LIVE CATTLE FUTURES AND OPTIONS............50**

A.    Futures and Options Generally....................................................51

B.    Live Cattle Contracts...................................................................52

1.    Live Cattle Futures ...........................................................53

2.    Live Cattle Options ...........................................................55

C.    Relationship Between Live Cattle Futures and Cattle Spot (Cash)
Prices ..........................................................................................57

D.    Packing Defendants Traded CME Live Cattle Futures and Options ..........58

E.    Packing Defendants Directly Caused CME Live Cattle Futures and
Options Prices to Be Artificial ...................................................... 61

**X.    CLASS ACTION ALLEGATIONS** ...................................................... **62**

**XI.    STATUTE OF LIMITATIONS AND TOLLING** ............................... **65**

**XII.    CLAIMS FOR RELIEF** ...................................................................... **67**

**XIII.    PRAYER FOR RELIEF** ..................................................................... **74**

**XIV.    JURY DEMAND** ................................................................................ **75**

Plaintiff Michael Sevy, individually and on behalf of himself and all those similarly situated, as defined below, brings this class action for treble damages and alleges as follows:

## I.   INTRODUCTION

1.   This action challenges Tyson Foods, Inc., Tyson Fresh Meats, Inc., JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., Cargill, Incorporated, Cargill Meat Solutions Corporation, Marfrig Global Foods S.A., and National Beef Packing Company, LLC's (the "Packing Defendants")[1] conspiracy to suppress the price of fed cattle that they purchased in the United States, from at least January 1, 2015 through the present (the "Class Period").   Packing Defendants' coordinated conduct, including slashing their respective slaughter volumes and curtailing their purchases of fed cattle in the cash cattle market, precipitated an unprecedented collapse in fed cattle prices in 2015.   Packing Defendants then continued to suppress the price of fed cattle through coordinated procurement practices and periodic slaughter restraint.   Packing Defendants' conspiracy directly impacted the market for live cattle futures and options traded on the Chicago Mercantile Exchange ("CME").

2.   Fed cattle are steers and heifers raised and fed for the production and sale of high quality beef products.   Packing Defendants are beef packers who purchase fed cattle for slaughter.   Packing Defendants then process the resulting carcasses into beef for sale to other processers, wholesalers, and retail outlets.   Live cattle futures contracts are

---

[1] Plaintiff reserves the right to amend his Complaint once the identities of any additional alleged conspirators are established.

standardized contracts traded on the CME in which the contract buyer agrees to take delivery, from the seller, of a specific quantity of fed cattle, at a predetermined price on a future delivery date.

3.      Packing Defendants control the U.S. market for the purchase of slaughter-weight fed cattle.  Following a series of mergers and acquisitions, beginning in the 1980s and culminating in 2013, Packing Defendants have purchased and slaughtered between 81-89% of all fed cattle sold within the United States on an annual basis.

4.      Packing Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef. As the supply of fed cattle is insensitive to short-term changes of price – owing to the long life cycle of fed cattle, their perishable nature, and their lack of any alternative use – and as beef demand is relatively insensitive to changes in price, the meat margin is very sensitive to changes in aggregate industry slaughter levels.  Consequently, Packing Defendants can increase the meat margin, and thus their profitability, by working cooperatively to reduce their respective slaughter volumes, thereby depressing the price of fed cattle.

5.      Packing Defendants procure about 70% of their fed cattle though alternative marketing agreements ("AMAs"), such as "formula" and "forward" contracts. Under these contracts, the producer agrees to deliver its cattle to a Packing Defendant once they have reached slaughter-weight at a price to be determined at or around the time of delivery.  The price formulas used by formula contracts typically incorporate reported prices of fed cattle sold in the weekly cash cattle trade, the industry's spot market.  The

price formulas used by forward contracts incorporate live cattle futures prices, which, in turn, are directly impacted by reported cash cattle prices. As a result, the prices paid for fed cattle in the cash cattle trade – which constitutes a mere 20-25% of all fed cattle sold in the United States – determines the price of almost all fed cattle bought by Packing Defendants.

6.    Against this backdrop, fed cattle prices increased steadily between 2009 and 2014 in response to strong beef demand and a shortage of fed cattle following the droughts of 2011 through 2013. After prices peaked in November 2014, the industry expected the price of fed cattle to stabilize in 2015 and continue at or around that level for a number of years.

7.    This widely predicted price stability did not occur. Instead, Packing Defendants used their market power, price sensitivities, and the thin cash cattle trade to their advantage and embarked upon a conspiracy to depress fed cattle prices. Their conspiracy to reduce fed cattle prices, and thereby increase the meat margin, was carried out through the following coordinated conduct: (1) Packing Defendants periodically reduced their slaughter volumes so as to reduce demand for fed cattle; (2) Packing Defendants curtailed their purchase and slaughter of cash cattle during those same periods; (3) Packing Defendants coordinated their procurement practices for cash cattle; (4) Packing Defendants imported foreign cattle at a loss so as to reduce domestic demand; and (5) Packing Defendants simultaneously closed and idled plants.

8.    Packing Defendants' conspiracy succeeded in precipitating an unprecedented collapse in fed cattle prices in the second half of 2015 and continued to suppress fed cattle prices thereafter.

9.    Despite the drastic collapse in fed cattle prices caused by Packing Defendants' conspiracy, Packing Defendants and their wholesale customers continued to benefit from record beef prices.  This disconnect allowed Packing Defendants to reap record per-head meat margins during the Class Period at the expense of fed cattle producers.

10.    Transaction data and slaughter volume records reported by Packing Defendants and published by the United States Department of Agriculture ("USDA") – as well as Packing Defendants' public calls for slaughter and capacity reductions – confirm that Packing Defendants agreed to depress the price of fed cattle bought during the Class Period.

11.    The same data demonstrate that Packing Defendants drastically reduced their purchases of cash cattle during these periods of slaughter restraint.  Packing Defendants did so in an attempt to "back-up" (that is, create a glut in) the number of slaughter-ready cash cattle and encourage producers to accept lower prices for their highly perishable product.  Doing so not only dropped cash cattle prices, but also the prices paid under Packing Defendants' formula and forward contracts.  Once Packing Defendants had broken the cash cattle trade and created a relative supply glut, Packing Defendants collectively ramped up their cash cattle purchases and reaped supra-competitive profits at the expense of the producers.

12.    In addition, Packing Defendants engaged in various collusive bidding practices that further suppressed prices.  In particular, Packing Defendants enforced, through threat of boycott, an antiquated "queuing protocol" which significantly limited cash cattle sellers' ability to generate price competition among Packing Defendants. Packing Defendants also typically conducted all, or substantially all, of their weekly cash cattle purchasing during a short 30- to 60-minute window late on Fridays, and would adhere to the price established by the Packing Defendant that had opened the weekly cash cattle trade.  The bidding practices of Packing Defendants differed from the practices of regional packers (a small percentage of the fed cattle purchasers), which bid on and purchased cash cattle throughout the week during the Class Period.

13.    Packing Defendants employed other procurement methods to depress the cash cattle price reports incorporated directly into their formula contracts and indirectly into their forward contracts.  In particular, import data show that Packing Defendants continued importing large numbers of live cattle for slaughter from Canada and Mexico, even after it became uneconomical for them to do so.  Such conduct would not have been economically rational but for Packing Defendants' agreement to curtail their domestic cash cattle purchases.

14.    Finally, Packing Defendants' closure and idling of certain plants immediately prior to and during the Class Period is strongly suggestive of an agreement amongst Packing Defendants to reduce or restrain their respective slaughter capacities so as to limit competition for the available supply of fed cattle.

15.    All of this conduct occurred in a market that is highly conducive to collusion for numerous reasons including: the small number of big market beef packers; the high barriers to entry; and frequent, easily accessible means of communications among Packing Defendants.  In relation to the latter, Packing Defendants' field buyers had ample opportunity to meet and exchange commercially sensitive information with each other every week as they inspected feedlots within their respective territories.[2]  Field buyers routinely communicated "market color" obtained from the field – including reports of their competitors' activities obtained from producers – back to their head office and their firms' other field buyers through daily conference calls.  Packing Defendants were also members of various trade and industry organizations, which provided additional opportunities to conspire.

16.    The evidence further supports the existence of the alleged conspiracy. Plaintiff's analysis shows that

    a.    Supply and demand drivers of fed cattle prices, and other commonly proffered explanations, do not explain the 2015 collapse in fed cattle prices or the low prices that have prevailed since then; and

    b.    Fed cattle prices have been artificially depressed in the three years since January 2015.

17.    As discussed herein (*see* Section IX), there is a strong relationship between the prices of "physical" cattle and live cattle futures and/or options.  As such, the Packing

---

[2] A feedlot is a plot of land on which cattle are fed intensively so as to reach slaughter weight.

Defendants' alleged manipulative conduct directly impacted the prices of live cattle futures and options traded on the CME. As a result of Packing Defendants' misconduct, Plaintiff and other Class members who transacted in live cattle futures and options on the CME during the Class Period suffered significant harm.

## II.    PARTIES

### A.    <u>Plaintiff</u>

18.    Plaintiff Michael Sevy is a resident of Fort Lauderdale, Florida. Sevy transacted in the live cattle futures during the Class Period, including the purchase and sale of live cattle futures contracts on the CME.

19.    As a consequence of the conduct described in this Complaint, Plaintiff suffered damages from a manipulated live cattle futures and options market. Plaintiff suffered monetary losses by transacting in live cattle futures and options at artificial prices directly resulting from Packing Defendants' conduct, including their suppression of fed cattle prices.

### B.    <u>The Tyson Defendants</u>

20.    Defendant Tyson Foods, Inc. ("Tyson Foods") is a Delaware corporation with its principal place of business located at 2200 Don Tyson Parkway, Springdale, Arkansas 72762.

21.    Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh Meats") is a wholly owned subsidiary of Tyson Foods. Tyson Fresh Meats is a Delaware corporation with its principal place of business located at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049.

22.     Defendants Tyson Foods and Tyson Fresh Meats are referred to collectively herein as "Tyson" or the "Tyson Defendants."

23.     During the Class Period, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of the Class in the United States and in this District.

### C.     The JBS Defendants

24.     Defendant JBS S.A. ("JBS") is a Brazilian corporation with its principal place of business located at Av. Marginal Direta do Tiete, 500 Bloco 3-3o. andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil.

25.     Defendant JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634.

26.     Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634.

27.     Defendant JBS Packerland, Inc. ("JBS Packerland") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634.

28.     Defendants JBS USA, Swift, and JBS Packerland were, throughout the Class Period, wholly-owned, direct or indirect subsidiaries of JBS.  Defendants JBS, JBS

USA, Swift, and JBS Packerland are referred to collectively herein as "JBS" or the "JBS Defendants."

29.    During the Class Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of the Class in the United States and in this District.

**D.    The Cargill Defendants**

30.    Defendant Cargill, Incorporated ("Cargill") is a Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391.

31.    Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) ("Cargill Meat"), a subsidiary of Cargill, is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202.

32.    Defendants Cargill and Cargill Meat are referred to collectively herein as "Cargill" or the "Cargill Defendants."

33.    During the Class Period, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of the Class in the United States and in this District.

**E.    The National Beef Defendants**

34.    Defendant Marfrig Global Foods S.A. ("Marfrig") is a Brazilian corporation with its principal place of business at Av. Queiroz Filho, 1560 Sabia Tower, 3rd Floor, Vila Hamburguesa, Sao Paulo, SP 05319.    Marfrig is a meatpacking

conglomerate with operations around the world and, since June 2018, owns a controlling interest in National Beef Packing Company, LLC.

35.    Defendant National Beef Packing Company, LLC ("National Beef Packing") is a Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163.

36.    Marfrig and National Beef Packing are referred to collectively herein as "National Beef" or the "National Beef Defendants."

37.    During the Class Period, the National Beef Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of the Class in the United States and in this District.

### F.    Packing Defendants

38.    During the Class Period, each Packing Defendant purchased fed cattle in the United States.  Plaintiffs are informed and believe that, in 2017, Tyson, JBS, Cargill, and National Beef accounted for 26%, 21%, 22%, 12.5% of the total U.S. fed cattle slaughter, respectively.  Additionally, upon information and belief, in their 2017 fiscal years, Tyson, JBS, Cargill, and National Beef had approximately $14.5 billion, $13.4 billion, $13.1 billion, $7.34 billion, in sales in their respective beef segments.[3]

---

[3] Jefferies 2018 Annual Report at 38; National Cattlemen's Beef Association, "Directions statistics" (2008), at 2, *available at* http://www.beefusa.org/CMDocs/BeefUSA/Publications/CattleFaxSection.pdf.

39.    During the Class Period, each Packing Defendant exploited the relationship between physical cash cattle and the CME live cattle market and transacted in cattle futures and/or options at prices that they had suppressed.

40.    Each Packing Defendant was a co-conspirator with the other Packing Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

### G.    John Doe Defendants

41.    John Doe Defendants are those packing firms, financial institutions, and/or trading firms that participated in the manipulation of the live cattle futures and options market, as described herein.  The identity of individuals and firms that trade CME futures and options is anonymous and not available to the public.  Plaintiff will be able to identify the John Doe Defendants through discovery of trading records in possession of the CME Group Inc. that it is required to maintain under the Commodity Exchange Act ("CEA") including, but not limited to, Order Entry Operator identifications, Tag 50 IDs, User Assigned IDs, and Clearing Information.  The John Doe Defendants are only named as to the causes of action alleged in this Complaint arising under federal statutes over which this Court has original jurisdiction.

### H.    Agents and Affiliates

42.    "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, and directors.

43.    Whenever reference is made to any act, deed, or transaction of any

corporate group, corporation, or partnership, the allegation means that the corporate group, corporation, or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parents, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

## III.    JURISDICTION, VENUE AND COMMERCE

44.    This action arises under Section 1 of the Sherman Act (15 U.S.C. §1), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), and Sections 2(a), 6(c) and 22 of the Commodity Exchange Act (7 U.S.C. §1 *et seq.*).  The action is for injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorneys' fees.

45.    This Court has federal question subject matter jurisdiction under 28 U.S.C. §§1331, 1332(d), and 1337, Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), and Section 22 of the Commodity Exchange Act (7 U.S.C. §25).

46.    Venue is proper in this District under 15 U.S.C. §§15 and 22 and 28 U.S.C. §1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiff's claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District, including:

a.    Cargill is domiciled in this District;

b.  Packing Defendants purchased fed cattle owned or located in this District;[4]

c.  Packing Defendants processed the resultant beef at plants located in this District and/or sold resultant beef products to customers located in this District.[5]

47.  The conduct detailed in ¶46 furthered Defendants' conspiracy to profit from the violations of law alleged herein.

48.  Defendants' conspiracy and conduct were within the flow of, were intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States.  During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal scheme.

49.  This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, is located, or its co-conspirators committed overt acts in furtherance of the illegal conspiracy and manipulation of the cattle futures and options market, in the United States, including in this District.  Defendants should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts related to their business conducted here.

---

[4] The 2017 USDA Census of Agriculture records that approximately 1.4 million beef cattle were sold from Minnesota farms in 2017.  *See* USDA, "Census of Agriculture", Volume 1, Chapter 1: State Level Data: Minnesota, Table 16, https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_State_Level/Minnesota/st27_1_0015_0016.pdf (last visited May 9, 2019); *See also* American Angus Association, "Feedlots," https://www.angus.org/Commercial/Links/CommFeedlotRpt.aspx#MN (last visited May 9, 2019).

[5] Specifically, Cargill operated a protein processing plant in Albert Lea, Minnesota, which processed beef during the Class Period.

50.    During the Class Period, all Defendants, both foreign and domestic, engaged in conduct within the United States related to Plaintiff's allegations. Defendants' misconduct was purposefully directed at the United States and was specifically intended to affect the prices of fed cattle bought within the United States and live cattle futures and options transacted by the Defendants with U.S. counterparties. Defendants' acts were acts in furtherance of the conspiracy that, because they occurred in the United States by Defendants' domestic entities, provide specific personal jurisdiction over all conspirators.

51.    The conspiracy and the overt acts taken in furtherance of it, were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

52.    As members of the conspiracy, foreign-based Defendants are liable for acts taken in furtherance of the conspiracy by domestic Defendants, as well as their own actions taken in the United States, and personal jurisdiction attaches, regardless of whether some portion of the conduct in furtherance of the conspiracy might have occurred overseas.

## IV.    OVERVIEW OF THE FED CATTLE MARKET

53.    In 2017, 25.8 million fed cattle were slaughtered and processed into beef products, accounting for 80% of the 32.2 million commercial cattle slaughtered across the

United States.[6]

54.    The cattle production cycle, running from birth to slaughter, typically ranges between 15 to 24 months, and is the longest of all animals typically raised for meat.  Fed cattle availability varies seasonally, with supplies being more plentiful over the summer months owing to the fact that the majority of calves are born in the spring.

55.    Fed cattle progress through three interrelated sectors prior to slaughter: cow/calf; stocking and background; and feedlots, as detailed in Figure 1 below.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[6] The remaining volume comprised slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products such as hamburger patties.  "2017 Meat & Poultry Facts, 46th Ed.," NORTH AMERICAN MEAT INSTITUTE, 2018, at 11 ("2017 Meat & Poultry Facts").

**Figure 1.  Cattle and Beef Industry from Breeding to Consumption**[7]



56.    Once cattle reach between around 950 and 1,500 pounds they are marketed,

transported to, and slaughtered at a packing plant operated by a beef packer such as one

of the Packing Defendants.  Packing Defendants process the carcasses into various primal

cuts that are then vacuum-packed and boxed for sale to customers of "boxed beef" who

process it into cuts that are ultimately sold to consumers at retail, restaurants, and other

foodservice operations.  Customers of boxed beef include foodservice companies such as

---

[7] U.S. Gov't Accountability Off., GAO-18-296, U.S. Department of Agriculture: Additional Data Analysis Could Enhance Monitoring of U.S. Cattle Market (Apr. 2018) ("2018 GAO Report"), at 6, *available at* https://www.gao.gov/assets/700/691178.pdf.

Sysco and US Foods and large retailers such as Costco and Sam's Club. Boxed beef is a commodity product, and competition to sell boxed beef is primarily on price as between boxes of equivalent USDA quality and yield grades.[8] Packing Defendants also process boxed beef in-house, and sell case-ready beef and other value added products (*e.g.*, sausages) directly to retailers, restaurants, hospitals, and others at a premium over boxed beef prices. Certain customers will purchase both boxed beef and processed products from Packing Defendants.

57.    As a perishable product, the majority of beef sold domestically is sold on short-term contracts. Certain large purchasers, such as Walmart or national restaurant chains such as Outback Steakhouse, purchase some of their beef on "forward" contracts (pursuant to which beef is sold 22 days or more prior to delivery) and other long-term supply agreements.

58.    Each Packing Defendant operates a live cattle procurement team, run by a head buyer, who is supported by a number of "field buyers" who are responsible for stated territories. Field buyers acquire cattle from feedlots situated inside their territory. They conduct negotiations directly with the fed cattle producers and their agents within the parameters set by their head buyer.[9]

---

[8] Amended Complaint, ¶ 24, *U.S. v. JBS SA* (N.D. Ill., Eastern Division) (08-cv-05992), filed on November 7, 2008 ("*U.S. v. JBS* Amended Complaint").

[9] Producers commonly delegate authority for marketing their cattle to the commercial feedlot, which has fed their cattle, or to third-party marketing cooperatives. A small portion of the fed cattle sales to Packing Defendants also occur at public auctions.

59. Each Packing Defendant seeks to procure sufficient fed cattle to operate its slaughter plants at its chosen utilization rates without interruption. Weekly plant capacity is determined not only by plant size, but by the number and length of shifts run in a given week. Packing Defendants' average cost of production increases if they underutilize their plant capacity. Thus, it is in the individual interest of each Packing Defendant to make sure that it has timely access to sufficient fed cattle to run its plants efficiently.

60. Prior to the consolidation of the beef packing industry, almost all fed cattle was sold through the "cash" or "negotiated" cattle trade:[10] meat packers' buyers went to feedlots and auctions and paid a cattle price set each day at the dollar mark where supply and demand met.

61. However, by 2015, the cash cattle trade had been drastically thinned, and now accounts for only 20-25% of national fed cattle sales. Despite this, the cash cattle trade remains the industry's price discovery mechanism and continues to determine the price of the nearly 71% of fed cattle bought pursuant to "formula" or "forward" contracts. Under these agreements, commonly referred to as "captive supply" agreements, producers commit to deliver their cattle to a packer once they have obtained slaughter-weight at a price to be determined at or around the point of delivery pursuant to an agreed-upon formula.

---

[10] For the avoidance of doubt, Plaintiff does not allege that there are separate or sub-markets in the U.S. product market for the purchase of fed cattle, whether demarcated by contracting type or otherwise.

**Figure 2.   USDA Records of Fed Cattle Procurement Methods – U.S. – 2005 to 2018**[11]



62.    The price of cattle delivered under formula contracts is determined by reference to a stipulated measure of cash cattle prices at, or just prior to, the date of delivery.  These contracts commonly incorporate a specified average cash price reported by the USDA Agricultural Marketing Service's ("AMS") Livestock Mandatory Reporting's ("LMR") cattle transaction price summaries.[12]  Moreover, the price of cattle delivered under forward contracts is typically established by reference to the price of the

---

[11] Under negotiated grid contracts the seller and buyer negotiate a base price, which is then raised or lowered through the application of premiums or discounts after slaughter based on carcass performance.  Negotiated grid contracts' base prices tend to move in parallel with cash cattle prices.

[12] These price series collate the information Packing Defendants and others are required to submit to the USDA on a daily and weekly basis regarding their live cattle purchases and deliveries pursuant to the Livestock Mandatory Reporting Act of 1999.  The Act imposes similar reporting obligations upon packers in relation to their boxed beef sales.

live cattle futures contract settling in the month of or adjacent to the expected delivery date. As explained in Section IX, the price of live cattle futures contracts is directly impacted by current and expected cash cattle prices. Thus, the price of cash cattle sets or drives the price of the bulk of Packing Defendants' fed cattle purchases, despite constituting only a small percentage of total fed cattle purchases.[13]

63. Each Packing Defendant uses captive supply agreements for the bulk of its procurement needs. This has both incentivized and facilitated Packing Defendants' suppression of cash cattle prices. The greater a Packing Defendant's supply of captive cattle, the less reliant it becomes on participating in the cash cattle trade to procure sufficient cattle to operate its slaughter plants at its chosen utilization rates. This, in turn, allows a Packing Defendant to abstain from purchasing cash cattle when it regards market prices to be too high. All things being equal, a reduction in demand for cash cattle results in a drop in cash cattle prices, as producers are forced to lower their asking price in order to attract a buyer willing to purchase and slaughter the producer's perishable product (*See* Section VII(C) below). And because cash cattle prices are used to set the prices paid under formula contracts and directly impact the live cattle futures prices incorporated into forward agreements, a reduction in cash cattle prices reduces the price paid by Packing Defendants for cattle bought on such contracts.

64. As the cost of fed cattle constitutes the majority of their costs of production, Packing Defendants' profitability is driven by the "meat margin," which is the spread

---

[13] The base prices used in negotiated grid contracts are also impacted by changes in cash cattle prices.

between the price packers pay for fed cattle and the price they charge for beef.[14]  The

meat margin is very sensitive to changes in industry aggregate slaughter levels, and

Packing Defendants can, through cooperation, increase it.  As noted by the U.S.

Department of Justice ("DOJ"),

> all else being equal, when the meat packing industry reduces production
> levels, feedlots and cattle producers are paid less for fed cattle because fewer
> fed cattle are demanded and customers pay more for [beef] because less is
> available for purchase.  Because the supply of fed cattle and demand for
> [beef] are relatively insensitive to short-term changes in price, even small
> changes in industry production levels can significantly affect packer
> profits.[15]

As a result of these sensitivities, Packing Defendants can improve their profitability by

coordinating their respective slaughter levels at or below the prevailing supply of

slaughter-weight fed cattle.

65.    The fed cattle market itself is highly concentrated.  In fact, during the Class

Period, Packing Defendants have collectively purchased and slaughtered between 81-

85% of the 23 to 27 million fed cattle slaughtered in the United States annually.[16]

66.    During this same period, Packing Defendants' respective shares of annual

fed cattle slaughter volumes have remained stable despite any yearly variation in

slaughter numbers.  The remainder of the U.S.'s fed cattle slaughter capacity is

---

[14] Jeffries 2018 Annual Report, at 38 ("National Beef's profitability is dependent, in large part, on the spread between its costs for live cattle, the primary raw material for its business, and the value received from selling boxed beef and other products, coupled with its overall volume.").

[15] *U.S. v. JBS* Amended Complaint, ¶ 26-27.  *See also* Section VII(B) below regarding the elasticities of fed cattle and beef.

[16] 2017 Meat & Poultry Facts at 11.

predominately provided by regional independent packing businesses such as Greater Omaha and Nebraska Beef, which typically only operate one plant ("Regional Packers").[17]

## V.    PACKING DEFENDANTS CONSPIRED TO DEPRESS FED CATTLE PRICES

67.    Fed cattle prices increased consistently from 2009 through 2014, peaking in November 2014 at approximately $170 per hundredweight ("CWT").[18]  Market analysts, such as the USDA Economic Research Service, predicted that the price levels established in 2014 would continue for a number of years before experiencing a gradual decline.[19] Some forecasters even foresaw no drastic change from 2014 prices "barring any outside market shocks like drought or a U.S. economic recession."[20]

---

[17] Lee Schulz, *et al*., "Economic Importance of Iowa's Beef Industry," IOWA STATE UNIVERSITY (Dec. 2017), *available at* https://store.extension.iastate.edu/product/Economic-Importance-of-Iowas-Beef-Industry.

[18] Cattle are typically priced on a live-weight basis (the price per CWT applied to the live-weight of the animal prior to slaughter, typically immediately prior to delivery) or a carcass-weight or "dressed" basis (the price per CWT applied to the animal once "dressed," *i.e.*, slaughtered with its head, hide, and internal organs removed).  References to fed cattle prices in this Complaint are on a live-weight basis unless otherwise stated. Live-weight and carcass-weight prices typically move together, as both are based on the expected value of the cattle once slaughtered.

[19] U.S. Dep't of Agric., OCE-2015-1, Off. of the Chief Economist: USDA Agricultural Projections to 2024, Interagency Agricultural Projections Committee (February 2015) at 81, https://www.usda.gov/oce/commodity/projections/USDA_Agricultural_Projections_to_2024.pdf (last visited May 9, 2019).

[20] "Livestock Monitor, A Newsletter for Extension Staff," LIVESTOCK MARKETING INFORMATION CENTER, STATE EXTENSION SERVICES IN COOPERATION WITH USDA (Jan. 12, 2015), at 2; and "CattleFax Predicts Strong Prices to Remain in 2015," AGWEB (Feb. 6, 2015), https://www.agweb.com/article/cattlefax-predicts-strong-prices-to-remain-in-2015-naa-news-release/ ("Analyst[s] . . . expect fed cattle prices averaging in the mid-

68.    While Packing Defendants initially benefited from the rise in fed cattle prices because wholesale beef prices rose in parallel, the meat margin fell to a low of approximately $50 in the months leading up to 2015, sending the packers' margins into the red.

69.    In response, Packing Defendants commenced and/or accelerated their conspiracy to depress and stabilize the price of fed cattle purchased in the United States. The core of their collusion was an agreement to reduce and then manage their respective slaughter volumes: a classic abuse of monopsony, or unfair buying power.  Packing Defendants implemented their conspiracy, by, among other conduct, agreeing to: (1) periodically restrain or reduce slaughter numbers so as to reduce demand for fed cattle; (2) curtail their purchases of cash cattle during these periods; (3) coordinate their procurement practices with respect to the cash cattle they did in fact purchase; (4) import foreign cattle to depress demand for cheaper domestic cattle; and (5) close or idle slaughter plants and refrain from expanding their remaining slaughtering capacity.

**A.    <u>Packing Defendants Agreed to Slash Cash Cattle Purchases During Slaughter Reductions</u>**

70.    To place further pressure on cattle prices, Packing Defendants agreed to drastically reduce their purchase of cash cattle during periods of agreed slaughter reduction or restraint.  When doing so, Packing Defendants could still obtain the cattle needed to satisfy their curtailed kill numbers by leaning upon their own cattle and cattle

---

$150s [per CWT in 2015], slightly higher than last year.  Prices will trade in a range from the near $140 [per CWT] in the lows to near $170 [per CWT] in the highs in the year ahead.") (last visited May 9, 2019).

deliverable under previously-agreed formula and forward contracts.[21]    And, because Packing Defendants had successfully thinned the cash cattle trade in the decade preceding 2015, even small reductions in their cash cattle purchases had an outsized impact on cash cattle demand.

71.    By reducing their purchases of cash cattle, Packing Defendants sought to reduce the price of all cattle by utilizing the link between cash cattle prices and the prices paid under formula and forward contracts.  By reducing their cash cattle purchases for a period of weeks or months, Packing Defendants could "back-up" the volume of slaughter-ready cash cattle, thereby encouraging producers to overfeed their cattle and/or accept lower prices or enter captive supply agreements to timely market their perishable product.[22]

---

[21] Until recently, Defendants JBS and Cargill owned two of the nation's largest feedlot businesses and fed a large number of their own cattle for slaughter at their respective plants.  Both continue to purchase all of the cattle fed by their former feedlots.  *See also* Cassie Fish, "Futures Treading Water; Packers Keep Pressure On" The Beef (Jun. 17, 2015),    https://www.thebeefread.com/2015/06/17/futures-treading-water-packers-keep-pressure-on/ ("The news is well known this week and the packer has the upper hand. Boxes are higher and margins are black but packers are keeping kills small.  The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.") (last visited May 9, 2019).

[22] Cassie Fish, "Whatever Happened to a Fair Fight," THE BEEF (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/ ("The conversation is no longer, what's cash going to be, but rather, who needs any. . . .  The smaller feeder is left to fight it out.  Hoping he can get a buyer to come by and look at his cattle.  Pressured to sell cattle with time.  Anything to get cattle gone.  Those that attempt to fight the market run the risk of making cattle too big even by today's standards or worse, alienate their local buyer.  Powerlessness is widely felt by smaller producers on a regular basis.") (last visited May 9, 2019).

72.     The lower reported cash prices were then incorporated into Packing Defendants' formula and forward contacts – the latter via a depression of live cattle future prices – thereby lowering the costs of all the cattle delivered to Packing Defendants' plants.[23]  And once a condition of actual or perceived oversupply had been created, Packing Defendants could gradually increase their cash cattle purchases (and slaughter volumes) without putting any significant upward pressure on prices.

73.     As detailed in Section VI below, Packing Defendants' implementation of this scheme precipitated the dramatic collapse in fed cattle prices in 2015.

**B.     Packing Defendants Coordinated their Procurement Practices for Cash Cattle**

74.     A third prong of Defendants' conspiracy involved coordinating the means by which each Packing Defendant purchased cash cattle.

75.     First, Packing Defendants supported their conspiracy by collectively enforcing an antiquated queuing convention via threats of boycott.  That convention works as follows:  once a bid is received from Packer A, the producer may either accept the bid or pass on it, but may not "shop" that bid to other packers.  If the producer passes on the bid to seek further bids from other packers, the producer must inform them that it

---

[23] Cassie Fish, "Cash Trade Volume Tiny; Futures Shake it Off," THE BEEF (Jun. 8, 2015),  https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet.  But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.") (last visited May 9, 2019).

was bid "X" by Packer A and that it can, therefore, only accept bids of X+$1.[24]  If Packer B is only willing to bid X or if the producer wants to alter its reservation price, the producer is obligated to first return to Packer A, who is "on the cattle" at price X and offer it a right-of-first-refusal.  Only if Packer A declines can the producer offer to sell to Packer B at X or his new reservation price.  At this point, however, Packer B is under no obligation to purchase from the producer.

76.    Second, a Packing Defendant would, for periods of time, sometimes extending across many months, offer the only bid (or the only credible bid) for a particular feedlot's fed cattle (or substantially all its fed cattle) week to week, ensuring that the feedlots affected could not regularly procure credible bids from the other Packing Defendants.  Buyers for these other Packing Defendants would even routinely fail to take or return calls from the producer until after the Friday trading window had closed.  These arrangements – akin to a "home-market" market allocation scheme – point to an agreement among Packing Defendants to respect each other's relationships with their preferred suppliers.

77.    Third, Packing Defendants would, at times, stop buying cash cattle from feedlots located in a particular region for a number of weeks.  In doing so they intended to back-up cash cattle in those regions and break the resolve of affected producers to hold-out for higher prices.  Having boycotted a region for a number of weeks, Packing Defendants would then begin purchasing cattle from that region again during the same

---

[24] In certain instances, it may be acceptable to offer/accept bids in $0.50 per CWT increments.

week.  When executing this scheme, Packing Defendants would often seek to initiate their weekly cash cattle trade in the region recently boycotted.  This allowed them to use the lower prices agreed upon in that region to set the "market" for the remainder of the trade.  In doing so, Packing Defendants were able to influence the prices of fed cattle sales across the United States.[25]

78.   Fourth, Packing Defendants suspiciously all chose to reserve most of their weekly cash trade procurement activity for Friday, typically after the CME had closed.[26] While the exact time on Friday varied from week to week, Packing Defendants would consistently conduct all, or substantially all, of their weekly cash cattle trade during the same 30 to 60 minute window on a Friday.  During that window, Packing Defendants would typically adhere to the price level established by the Packing Defendant that opened the weekly cash cattle trade, which would quickly be circulated across the market via word-of-mouth and industry reporting.  If a Packing Defendant felt it necessary to offer prices above this price level to secure the cattle it required, it would often hold such bids back until after the core trading window had closed.  This reduced the chance that reports of such bids might impact negotiations conducted during the core trading window.  In contrast, Regional Packers continued to purchase cash cattle across nearly

---

[25] For similar reasons, Packing Defendants would also, at times, seek to set the market price lower by opening the weekly trade by purchasing a pen of poor quality cattle at a discount.

[26] This deprives producers of a price discovery mechanism and limits the ability of producers who hedge their cattle on the CME to manage their positions in response to the bids offered by the packers.

every day of the week, thereby securing pens of high quality cattle with limited competition. When operated alongside Packing Defendants' slaughter restraint and other bidding practices (outlined above), this practice effectively reduced competition amongst Packing Defendants for cash cattle to a race to place the first bid on each pen during the Friday cash trade.

79.     The existence of an agreement among Packing Defendants permitted them to both: (1) limit their purchases of cash cattle; and (2) conduct all, or substantially all, of their cash cattle trade in a short window on Fridays.[27] If any single Packing Defendant took these actions in the absence of such an agreement, that Packing Defendant would risk failing to secure a sufficient quantity or quality of cattle to operate its plants at the most efficient capacity and/or meet customer demand, without any guarantee that its actions would have the desired impact on fed cattle or beef prices.

/ / /

/ / /

/ / /

---

[27] But for Packing Defendants' agreement to conduct the majority of their cash cattle procurement on Fridays, there would be fewer days per month with no reported transactions as Packing Defendants could reasonably be expected to conduct their purchases across the week. As the daily transaction reports published by AMS capture purchases agreed between 2pm Central the prior day until 2pm Central the current day, it is not possible to identify specifically the number of transactions conducted, as opposed to reported, per day. However, analysis does confirm that the vast majority of weekly cash cattle transactions over the Class Period were reported on Fridays and Mondays. This is further evidence that the majority of Packing Defendants' cash cattle purchasers are agreed on Fridays in circumstances that: a) Friday's reports include purchases made between 2pm Thursday and 2pm Friday; b) Monday's reports include purchases made between 2pm Friday and 2pm Monday; and c) very few trades occur on Mondays.

### C.     Packing Defendants Uneconomically Imported Foreign Live Cattle to Depress Demand for U.S. Fed Cattle

80.     Packing Defendants also engaged in coordinated import and shipping practices that reduced demand for domestic fed cattle and suppressed the cash price transaction reports used to set the price of cattle procured under captive supply agreements.  In particular, Packing Defendants would ship cattle over uneconomically long distances to their slaughter plants, from locations both inside the United States and from Canada and Mexico, to avoid bidding up the reported price of cattle in closer AMS LMR reporting regions.

81.     Given the additional freight costs incurred in procuring fed cattle from Canada or Mexico, it is only economic for a Packing Defendant to do so where the prevailing price differences as against domestic prices exceeded these additional costs. But Plaintiff's analysis suggests that Packing Defendants' import of live cattle from Canada and Mexico began to increase slightly in 2014, and continued, even after it became uneconomical for them to do so in or around mid-2015.[28]

82.     These actions are consistent with an intent to depress U.S. fed cattle cash prices.  A Packing Defendant would not incur the additional cost associated with the import and purchase of foreign or extra-regional cattle in the hope of lowering its captive supply procurement costs unless it was certain that its major competitors would do the same thing, and therefore, also abstain from bidding up local cash cattle prices.

---

[28] On information and belief, Plaintiff understands that Packing Defendants are responsible for the bulk of all live cattle imports for slaughter.

D. **Packing Defendants Agreed to Refrain from Expanding Their Slaughtering Capacity**

83.    In furtherance of their conspiracy to manipulate the fed cattle market, Packing Defendants also agreed to refrain from expanding their respective slaughtering capacity, or from increasing their utilization of existing capacity.  Indeed, during the run-up of fed cattle prices until their precipitous fall in mid-2015, Packing Defendants first sought to reduce demand through a series of plant closures:  Cargill closed its Plainview, Texas and Milwaukee, Wisconsin plants (4,000 and 1,300-1,400 head per day capacities, respectively) in February 2013 and August 2014, respectively;  National Beef shut its Brawley, California plant (2,000 head per day) in June 2014;  Tyson closed its Denison, Iowa plant (2,000 head per day) in August 2015; and JBS left its newly acquired Nampa, Idaho plant closed.  Packing Defendants' plant closures, even excluding the continued idling of the Nampa plant, stripped out approximately two million head from the industry's annual slaughter capacity, thereby limiting demand for fed cattle.  In relation to each closure, the relevant Packing Defendant offered pre-textual explanations such as a lack of available cattle in the adjacent regions and plant inefficiencies.[29]

84.    As a result, the United States has experienced both a decline in fed cattle slaughter capacity and an underutilization of that capacity.  This decline in marketing outlets for fed cattle producers has been compounded in certain regions, where fed cattle

---

[29] National Beef even rejected a significant package of incentives offered by local government, utilities and nearby feedlots when it decided to close its Brawley plant. "National Beef plant closing Brawley Facility," PROGRESSIVE CATTLEMAN (March 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plant-closing-brawley-facility (last visited May 9, 2019).

producers now only have one, or possibly two, slaughter plants to which they are able to sell their cattle.

## VI.    PACKING DEFENDANTS' CONSPIRACY CAUSED THE 2015 PRICE COLLAPSE AND SUPPRESSED PRICES THEREAFTER

### A.    Packing Defendants' Conduct Precipitated the Collapse in Fed Cattle Prices in 2015

85.    Packing Defendants' coordinated conduct was successful.  Responding to the compression of their margins in late 2014, Packing Defendants reduced their slaughter volumes.  This reduction in slaughter levels had the desired effect.  For the first half of 2015, prices fluctuated at or around $160 CWT, $10 CWT (or about $130 per head) lower than the high established in November 2014.

86.    Not satisfied with this, Packing Defendants embarked upon an unprecedented slaughter reduction during the second and third quarters of 2015.  To place further pressure on cattle prices, Packing Defendants also drastically reduced their purchase of cash cattle, leaning heavily on their own cattle and other captive supplies to satisfy their curtailed kill numbers.[30]  Packing Defendants' strategy was immediately

---

[30] Packing Defendants' slaughter levels of their own cattle across the second half of 2015 were steady on a year-on-year basis, as reported by AMS LMR Report "LM_CT153 – National Weekly Direct Slaughter Cattle – Prior Week Slaughter and Contract Purchases," https://marketnews.usda.gov/mnp/ls-report-config (last visited May 9, 2019). *See also* Cassie Fish, "Cash Trade Volume Tiny; Futures Shake it Off" THE BEEF (Jun. 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet.  But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.  Only problem is, packers weren't able to secure enough cattle cheaper, even when relying on captives, to easily fill an even

successful, with cash cattle – and thus formula cattle – prices falling continuously across June to about $150 CWT.[31]  Meanwhile, with lower slaughter volumes and lower boxed beef output, the meat margin expanded rapidly, bloating Packing Defendants' margins.

87.    Tight fed cattle supplies do not explain Packing Defendants' reduced slaughter volume.  The available supply of fed cattle had actually increased on a year-on-year basis, reflecting the continuing rebuild of the cattle herd.

88.    Packing Defendants' determination to "break" cash cattle prices through their collective slaughter reductions and reduced cash cattle purchases was remarked upon by industry analysts at the time.  On June 12, 2015, analyst Cassandra Fish of "The Beef" and formerly a risk manager at Tyson, speculated as to when one of Packing Defendants might break ranks:

> Rarely has this industry segment [the beef packers,] been an all-for-one and one-for-all group.  All packers need to buy cattle inventory.  Most have cut hours.  So will someone break ranks, pay up for cattle and add hours to

---

curtailed kill expected this week at 540,000 head.  June forward contracts are rumored being called in as a way to offset the absence of negotiated purchases."); and Fish, "Futures Treading Water; Packers Keep Pressure On" *supra* note 21 ("The news is well known this week and the packer has the upper hand.  Boxes are higher and margins are black but packers are keeping kills small.  The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.") (last visited May 9, 2019).

[31]    Cassie    Fish,    "Smack    Down,"    THE    BEEF    (Jun.    15,    2015), https://www.thebeefread.com/2015/06/15/smack-down/ ("Cash cattle prices broke hard Friday as packers successfully executed a strategy of slashed kills and limited negotiated purchases. ").

> capture the better realization that the next boxed beef rally will bring? Will one short a customer only to find that order filled by a competitor?[32]

89. Ms. Fish answered her own question a few weeks later, remarking on June 25, 2015 that the "packers refuse to reach for cattle and are currently in command. After 3 weeks of sharply curtailed kills, packers are exhibiting incredible discipline and letting the kill increase gradually," limiting the ability "of feeders to get all cattle marketed [*i.e.*, sold] in a timely fashion."[33]

90. Packing Defendants tightened the screws during the remainder of 2015. They continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that slaughter-ready cattle had been "backed up" and were reaching historically heavy weights.[34]

91. This was particularly evident in September 2015, when Packing Defendants utilized the leverage they had established over producers in the prior months to great effect, pushing prices down to $120 CWT by months' end, despite increasing their purchases of cash cattle. Packing Defendants also demanded extended delivery periods of two to four weeks as a condition of trade throughout the month, providing them with

---

[32] Cassie Fish, "Futures Holding Gains; Waiting on Cash," THE BEEF (Jun. 11, 2015), https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/ (last visited May 9, 2019).

[33] Cassie Fish, "Another Round of the Blues," THE BEEF (Jun. 25, 2015), https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/ (last visited May 9, 2019).

[34] Cassie Fish, "Kills Too Small For Too Long," THE BEEF (Sep. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/ (last visited May 9, 2019).

further leverage over producers who still had cattle to sell.[35]  As a result, large numbers of the cash cattle sold in September were not slaughtered until October.

92.    As Ms. Fish lamented on November 10, 2015, the "[p]ackers no longer compete against each other to buy fed cattle each week," and were consequently reaping "gangbuster profits."[36]

93.    During the second half of 2015, after Packing Defendants embarked on their collusive reduction in slaughter volume, producer margins were materially reduced, while Packing Defendants' margins remained positive.

**B.    Packing Defendants' Ongoing Conduct Continues to Depress Fed Cattle Prices**

94.    Following their successful 2015, Packing Defendants continued to restrain their collective slaughter numbers and cash cattle purchases in 2016.  While monthly slaughter volumes for the first three quarters of 2016 were up on 2015's record lows, they remained flat or below 2014 levels despite the available supply of fed cattle having risen again.

95.    As a result, the price of fed cattle continued to fall across 2016 to a low of approximately $98 CWT in mid-October.  As in 2015, Packing Defendants responded by dramatically increasing kill volumes in the fourth quarter.  Kill levels in November 2016

---

[35]  *See, e.g.*, Cassie Fish, "No bottom in sight," THE BEEF (Sep. 16, 2015), https://www.thebeefread.com/2015/09/16/no-bottom-in-sight/ (last visited May 9, 2019).

[36]  Fish, *supra* note 22.

alone were up 24% and 19% on a year-on-year basis as compared to 2014 and 2015, respectively.[37]

96.    Packing Defendants' success in "backing-up" cash cattle across the summer of 2016 is confirmed by the fact that Packing Defendants were able to raise cash cattle slaughter levels 38% and 24% in the fourth quarter of 2016 as against 2014 and 2015 levels without causing a dramatic rise in prices.[38]  In fact, during the fourth quarter of 2016, prices remained steady at or around $100-$105 CWT until late November.  Prices then hovered between $110-$117 through December.[39]  This gradual price increase was consistent with the seasonal rise in fed cattle prices typically experienced in the fourth quarter of each year as the availability of slaughter-weight cattle declines.  But for the glut in slaughter-ready cattle created by Packing Defendants' coordinated actions, prices

---

[37]  Year-on-year comparisons calculated using USDA Market News Service Report "LM_CT106-National direct slaughter, committed and delivered," available here: https://marketnews.usda.gov/mnp/ls-report-config (last visited May 9, 2019).

[38]  *Id*.  *See* Cassie Fish, "And it All Falls Down," THE BEEF (Sep. 27, 2016), https://www.thebeefread.com/2016/09/27/and-it-all-falls-down/ ("The big carryover of unsold negotiated cattle from last week has gained negative status as the hours have rolled by, with packers willing and able to sit back and lower bids to $104, $6 lower than 2 weeks ago and $3 lower than the few that traded Friday and Saturday") (last visited May 9, 2019); *see also* Cassie Fish, "Despondency," THE BEEF (Oct. 11, 2018), https://www.thebeefread.com/2016/10/11/despondency/ ("As if on cue, kills this week are now rumored to be cutback to 585k-595k, with a cooler cleaning and Saturday kills out . . . .  A pull back in the kill with record packer margins cements the reality that easily and efficiently killing our way through the numbers, which used to be a reality, isn't any longer.  This makes it difficult for the market to return to fully current marketing status if there is any slowdown in kill.") (last visited May 9, 2019).

[39]  At these prices, Packing Defendants were purchasing cash cattle at a significant discount even compared to 2015's depressed prices.

would have risen significantly higher in response to the Defendants' dramatic increase in year-on-year slaughter numbers.

97.    As the cattle herd continued to rebuild, and more fed cattle became available for slaughter in 2017 and into 2018, Packing Defendants responded accordingly.  Having already reduced their slaughter volumes below historic levels and curtailed their cash cattle purchases, Packing Defendants began to tell the market that they had insufficient capacity to slaughter the supposed "wall of cattle" due to reach slaughter-weight in the summer of 2018.[40]  Packing Defendants thus encouraged producers to commit their cattle early on captive supply agreements to ensure they could "get their cattle dead" before Packing Defendants ran out of "hook" or "shackle space."[41] At the same time, Packing Defendants managed their respective slaughter volumes to ensure that their collective demand did not exceed the available supply.[42]

---

[40]    Cassie Fish, "Still Green!?!" THE BEEF (Mar. 27, 2018), https://www.thebeefread.com/2018/03/27/still-green/ ("The [packers'] mechanical [slaughter] capacity exceeds needs [across Q2 2018].  The limitation perception is linked to labor.  The perception of there being a limitation has created fear and inspired some cattle feeders to "get in line" by selling [cattle] out-front [*i.e.*, on captive supply agreements].") (last visited May 9, 2019).

[41]    *See* Cassie Fish, "Holding Gain," THE BEEF (Apr. 18, 2018), https://www.thebeefread.com/2018/04/18/holding-gains/ ("Cattle feeders, still fearful of growing supplies in May, June and beyond continue to sell cattle for May at substantially lower prices than current values.") (last visited May 9, 2019).

[42] Cassie Fish, "Futures Trade Both Sides; Cash Poised To Trade Lower," THE BEEF (Apr. 2, 2018), available at: https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-poised-to-trade-lower/ ("Looking back at March's fed slaughter rate, it underperformed expectations . . . .  Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable.") (last visited May 9, 2019).

98.    Packing Defendants' tactics succeeded.    Prices fell during late Winter/Spring 2018, despite record strong beef demand and tight supplies of slaughter-ready cattle across March and April.  Indeed, prices fell from approximately $129 per CWT at the beginning of March 2018 to $110 per CWT by the beginning of May 2018. Prices stayed at or around that mark until mid-November 2018, a significant extension of the one to two-month summer low typically experienced by the market.  And of course, Packing Defendants never did reach slaughter capacity.[43]

**C.    Packing Defendants Publicly Affirmed Their Commitment to Supply Restraint**

99.    Packing Defendants' joint efforts to periodically curtail slaughter levels so as to "balance" their demand to supply are further evidenced by public statements by their senior executives about their firms' commitment to production restraint and operating a "margin" rather than a "market share" business.  Explicit and implicit in the executives' statements was the importance of restricting slaughter levels and capacity across the industry as a whole.

100.    For example, commenting on National Beef's decision to close its Brawley, California plant on January 31, 2014, Tyson's COO stated "it is consistent, I guess, with what we've been saying all along, as the calf crop declines and the noncompetitive

---

[43]    Cassie    Fish,    "Quiet    Conclusion,"    THE    BEEF    (Jun.    1,    2018), https://www.thebeefread.com/2018/06/01/quiet-conclusion/ ("As each week goes by in June, the calendar will take the industry into the heart of one of the most well-advertised "walls" of market-ready cattle in memory.  Now that it is a known fact that the industry can kill 540k head of fed cattle and that demand can absorb the largest beef production in 10-years, the panic experienced in March seems overdone.") (last visited May 9, 2019).

feedlot areas or noncompetitive plants or the combination thereof, we'll probably have to curtail production . . .  to some extent, we've always felt that - and anticipated something like that would happen."[44]

101.    As prices continued to rise in 2014, JBS director Wesley Mendonça Batista responded to an analyst's question as to whether U.S. fed cattle slaughtering capacity needed to be rationalized by suggesting that JBS's recent acquisition of XL Foods' Omaha, Nebraska plant was probably a mistake, and that slaughtering capacity needed to come out of California and at least one other U.S. region ("If you want to be balanced you need to have capacity to be shut there.").[45]

102.    Even after fed cattle prices had already collapsed, Tyson's then-CEO Donald Smith still publicly stressed the need for further slaughter reductions in August 2015: "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs.   In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term."[46]

103.    JBS's André Nogueira de Souza went further and publicly praised Packing Defendants' efforts to reduce industry-wide slaughter capacity through plant closures,

---

[44] Tyson Foods Q1 2014 Results Earnings Call Transcript (Jan. 31, 2014), at 4.

[45] JBS Q3 2014 Earnings Calls Transcript (Nov. 13, 2014), at 12.

[46] Tyson Foods Q3 2015 Results Earnings Call Transcript (Aug. 3, 2015), at 4.

noting that it had left the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018."[47]

104.    Packing Defendants' executives evidently knew that they needed to tread a narrow line in their public exhortations for slaughter restraint, as shown by Tyson's then CEO Donnie Smith's slip during his discussion of output restraint during Tyson's Q4 2015 Earnings Call:[48]

> You've got relatively low cattle supply, you've got too much -- well, not to say too much, probably not the right way to say it, but you've got excess industry capacity.  And that limits our ability to drive margins above the 1.5% to 3%, we think.

### D.    Other Explanations Proffered for the Drop in Fed Cattle Prices Do Not Withstand Scrutiny

105.    The United States Government Accountability Office's ("GAO") 2018 Report suggests potential explanations for the price collapse proffered by Packing Defendants and others.  These explanations, however, are not borne out by the facts.

106.    For example, the GAO Report mentions that the droughts of 2011-2013 might have reduced the availability of forage to raise calves and feeder cattle, leading ranchers to reduce cattle inventory.[49]  Under this explanation, ranchers expanded their inventory once the drought eased, thereby oversupplying the market and causing prices to crash.  However, any oversupply of feeder cattle should have caused a collapse in the price of feeder cattle, which did not happen until well after fed cattle prices had

---

[47] JBS Q3 2015 Results Earnings Call Transcript (Nov. 12, 2015), at 9.

[48] Tyson Foods Q4 2015 Earnings Call Transcript (Nov. 24, 2015).

[49] 2018 GAO Report at 12.

collapsed.

107.    It has also been suggested that the increase supply of corn seen in the aftermath of the 2011 to 2013 droughts encouraged fed cattle producers to feed their cattle for longer than they typically would.  The resulting fatter cattle then received lower prices per CWT, as is customary.  The majority of producers, however, did not choose to overfeed their cattle, but were forced into doing so by Packing Defendants' coordinated slaughter restrictions.

108.    Finally, the strengthening of the U.S. dollar in 2014 and potentially related changes in the volume of U.S. imports and exports of live cattle and beef also cannot explain the price collapse.[50]  These events were not even in lock-step with the collapse in fed cattle prices in the second half of 2015.  In fact, during the second half of 2014, when net imports of beef and the U.S. dollar were increasing, fed cattle prices still increased to their November 2014 peak.  In the first half of 2015, net imports were transiently around 8% of total U.S. production, but by November 2015 – when fed cattle prices had bottomed out – net imports of beef had turned slightly negative.

## VII.    THE FED CATTLE MARKET IS CONDUCIVE TO COLLUSION

109.    The structure and characteristics of the market for the purchase of fed cattle make the market highly susceptible to collusion.  These facts, when considered against the backdrop of the actions of Packing Defendants that are consistent with collusion and

---

[50] *Id.* at 14.

inconsistent with the proper functioning of a competitive market, support an inference of the anticompetitive agreement alleged herein.

### A.    The Fed Cattle Packing Industry Has Experienced High Consolidation and Is Highly Concentrated

110.    The Fed Cattle Packing industry is highly concentrated.[51]  Since JBS's acquisition of Smithfield Beef Group, Inc. in 2008, Packing Defendants' cumulative share of annual purchases of U.S. fed cattle has approximated 81-89% each year, with each Packing Defendant's individual share of annual purchases remaining largely static. No Regional Packer possesses a double-digit market share, with Greater Omaha, Packing Defendants' nearest rival, maintaining a 2.5-3.5% market share through its Omaha, Nebraska plant.  The GAO's 2018 Report found that lower "packer competition in any given area was associated with lower fed cattle prices in that area."[52]

### B.    The Supply of Fed Cattle and Demand for Beef Are Relatively Insensitive to Short-Term Changes in Price

111.    Recent studies have shown that the quantity of beef U.S. consumers purchase has become less sensitive to changes in beef prices, and the impact of such price

---

[51]  The U.S. national four-firm concentration ratio (CR4) for beef packing rose from 25% in 1977 to 71% in 1992, the first year in which the national Herfindahl-Hirschmann Index ("HHI") exceeded 1800.  Since that time, the HHI index for the industry has only increased, particularly in certain regions.  *U.S. v. JBS* Amended Complaint, ¶ 36-37; Cai, Stiegert, and Koontz, *Regime Switching and Oligopsony power: the case of US beef processing*, 41 AGRICULTURAL ECONOMICS  99-109, 99 (2011); Cai, Stiegert and Koontz, *Oligopsony Fed Cattle Pricing:  Did Mandatory Price Reporting Increase Meatpacker Market*, APPLIED ECONOMIC PERSPECTIVES AND POLICY 33(4), 606–622 (2011).

[52]  2018 GAO Report at 15-16.

changes on beef demand is economically small relative to other factors.[53]  Beef's own price elasticity for the period 2008-2017 was estimated at -0.479, indicating that a "10% price increase would reduce [beef] demand by 4.79%."[54]  As a result, Packing Defendants are incentivized to reduce fed cattle slaughter and beef production, as neither they, nor their immediate customers, are harmed by the resulting wholesale and retail price rises.

112.    Further, reduced slaughter volumes and/or lower fed cattle prices are unlikely to significantly alter the immediately available supply of fed cattle.  Owing to cattle's comparably long life cycle, cattle producers typically require about 39 months to alter supply levels once a decision has been made to increase production.[55]  As a result, fed cattle supplies are relatively insensitive to short-term price changes, particularly given the absence of a substitute market into which fed cattle producers can sell their cattle.

C.    **Fed Cattle Producers Face Significant Market Access Risk**

113.    As perishable commodities, producers face significant pressure to sell their cattle within a matter of weeks once they reach slaughter-weight.[56]  As noted by Grain

---

[53] Glynn Tonsor, Jason Lusk, Ted Schroeder, "Assessing Beef Demand Determinants" (Jan. 18, 2018), at 7-9, www.beefboard.org/news/files/FY2018/Assessing%20Beef%20Demand%20Determinants_FullReport.pdf (last visited May 9, 2019).

[54] *Id*.

[55] Tyson Foods Inc. "Investor Fact Book – Fiscal Year 2017" (2018), at 10, *available at* https://s22.q4cdn.com/104708849/files/doc_factbook/Tyson-Foods-FY17-Fact-Book-(rev-042518).pdf ("Tyson 2017 Fact Book"); 2018 GAO Report at 5.

[56] RTI International, "GIPSA Livestock and Meat Marketing Study, Vol. 3: Fed Cattle and Beef Industries," *prepared for* U.S.D.A. Grain Inspection, Packers and Stockyard Administration (2007), at 5-4, *available at* https://www.gipsa.usda.gov/psp/publication/livemarketstudy/LMMS_Vol_3.pdf (last visited May 9, 2019).

Inspection, Packers and Stockyards Administration (now a part of the AMS), "[c]attle held beyond the optimal marketing period begin to decrease in value because of excessive fat gain and the rising cost of gain."[57]  Further, continuing to hold slaughter-weight cattle increases the risk of death loss, which elevates after cattle spend more than 5-6 months in the feedlot.[58]

114.    These facts, coupled with the absence of a substitute market to sell fed cattle into, exposes fed cattle producers to market access risk, namely "the availability of a timely and appropriate market outlet."[59]

115.    That risk and the leverage it provides to Packing Defendants is exacerbated by the significant information asymmetry faced by producers *vis-à-vis* Packing Defendants with regard to the available supply of fed cattle and Packing Defendants' procurement needs.  In relation to the former, producers have only a limited ability to obtain information regarding the supply of fed cattle beyond the information conveyed by the USDA's Cattle on Feed Reports.  By contrast, Packing Defendants are able to construct detailed inventories of upcoming fed cattle supplies through their regular contacts with all the fed cattle producers situated within their respective procurement territories.

---

[57] *Id.*

[58] David Cooper, "Feedyard data reveals higher death losses," PROGRESSIVE CATTLEMAN (Dec. 24, 2015), https://www.progressivecattle.com/topics/herd-health/feedyard-data-reveals-higher-death-losses (last visited May 9, 2019).

[59] RTI International, *supra* note 56.

116.    The impact of market access risk upon the parties' relative bargaining power is significant.  As demonstrated by Packing Defendants' threats regarding 2018's supposed "wall of cattle," the mere use of coordinated threats of increased market access risk can be sufficient to coerce producers to commit cattle on captive supply agreements or accept lower cash prices.

### D.    There Are Numerous Trade Organizations and Opportunities for Packing Defendants to Meet and Collude

117.    Packing Defendants' management and employees have regular opportunities to meet and collude through their membership in various trade and industry associations, including: the National Cattlemen's Beef Association ("NCBA"); the U.S. Meat Export Federation ("USMEF"); the Global and U.S. Roundtables for Sustainable Beef ("USRSB")[60]; and the North American Meat Institute ("NAMI") (which resulted from the merger of The North American Meat Association and the American Meat Institute).

118.    For example, the NCBA holds an annual convention (known as "CattleCon"), a summer conference, a legislative conference, and regional meetings.[61] The NCBA Product Council, which includes Packing Defendants, other packers, and certain retailers and restaurants, meets quarterly for the Beef Executive Forum, an

---

[60]  In 2015, Packing Defendants were among the founding members of the USRSB. Packing Defendants participate in its annual meetings (held in spring), with JBS and Cargill additionally having leadership positions in certain working groups.

[61]  *NCBA Allied Industry Membership*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), www.beefusa.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20Allied%20Industry%20Brochure.pdf (last visited May 9, 2019).

invitation-only event.[62]  Representatives of each Packing Defendant typically attend these events.  Packing Defendants also participate in meetings of the Beef Checkoff program run by the Federation of State Beef Councils that are held in conjunction with the NCBA summer and winter meetings.[63]

119.    Similarly, the USMEF – a trade association that develops export opportunities for U.S. protein producers and whose leadership includes current and former employees and officers of Packing Defendants – holds both spring and fall conferences and monthly international trade shows.[64]

120.    The NAMI – which is a national trade association that represents companies that process 95% of red meat – conducts a series of annual conference and educational workshops all across the country.[65]

E.    **Packing Defendants Benefit from High Barriers to Entry**

121.    Packing Defendants benefit from substantial barriers to entry into the market.  As a result of these barriers, the entry of new fed cattle slaughter businesses, or

---

[62] *Id.*

[63]   *See also The Association*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/theassociation.aspx (last visited May 9, 2019); and *Federation*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/federation.aspx (last visited May 9, 2019).

[64] *Events: Meetings*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/bod-meetings/ (last visited May 9, 2019); *Events: Trade Show Calendar*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/trade-shows/ (last visited May 9, 2019).

[65] *See About NAMI*, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204 (last visited May 9, 2019); *Events*, NAT'L AMERICAN MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422 (last visited May 9, 2019).

the repurposing of existing cow and bull slaughter facilities, is not likely to occur despite any decrease in the price of fed cattle or increase in the wholesale price of beef.[66]

122.    The construction of a large packing plant requires an investment of at least $250-$350 million, and two or more years to obtain necessary permits, plan, design, and build.[67]  The construction of smaller plants, with capacity to slaughter approximately 1,000 - 1,500 head per day, would take a similar period of time and cost at least $150 million.[68]  Re-purposing an existing plant, or reopening a similar sized, but previously shuttered, plant costs at least $40 million.[69]

123.    Aside from the costs and time associated with opening a plant, new entrants face difficulties complying with a significant volume of regulations, finding and training a workforce of between 1,500 to 3,000 staff, and finding marketing outlets for the resultant beef.[70]

---

[66] *U.S. v. JBS* Amended Complaint, ¶41.

[67] *Id.*  Plaintiff understands that the last major plant constructed by Packing Defendants – Tyson's plant in Lexington, Nebraska – cost over $250 million to construction 1991 and would likely cost significantly more in today's money.

[68] Amanda Ranke, "What's the Future For Northern Beef Packers?" BEEF (Jul. 22, 2013), www.beefmagazine.com/blog/whats-future-northern-beef-packers (last visited May 9, 2019); Press Release, "JR Simplot Company and Caviness Beef Packers to Build New Idaho Beef Processing Plant" J.R. Simplot (Jan. 7 2015), www.simplot.com/news/jr_simplot_company_and_caviness_beef_packers_to_build_new_idaho_beef (last visited May 9, 2019).

[69] This is the amount Iowa Premium Beef spent refurbishing the previously shuttered Tama, Iowa plant.

[70] For example, one recent successful entrance, namely Iowa Premium Beef's reopening of the Tama, Iowa plant, was made possible by Sysco's agreement to invest $36 million in the plant and take delivery of a significant volume of the resultant beef produced.

124.    As a result, an industry rule of thumb is that a newly opened packing plant will lose at least 60% of its initial investment before it begins to profitably sell any of its beef product.  Not surprisingly, recent years have seen the failure of new or re-launched independent fed cattle packing businesses, including Northern Beef Packers and Kane Beef.[71]

### F.    Packing Defendants Have Similar Cost Structures and Have Significant Oversight of Each Other's Price and Production Decisions

125.    As a result of their similar cost structures,[72]  Packing Defendants have a limited ability to steal market share from each other by operating with compressed meat margins (*i.e.*, bidding high for cattle and asking low for beef).  But consequently, they do have a shared interest in manipulating the meat margin to extract increased profits from their existing market shares.

126.    Packing Defendants' field buyers' weekly trips to inspect the feedlots in their territory provide an opportunity to meet and exchange commercially sensitive information amongst each other.  Field buyers routinely communicate "market color"

---

[71] Amanda Radke, "What's the Future for Northern Beef Packers?" BEEF (July 22, 2013), www.beefmagazine.com/blog/whats-future-northern-beef-packers (last visited May 9, 2019); Dirk Lammers, "Aberdeen beef plant open again and slaughtering" CAPITAL JOURNAL (November 19, 2015), www.capjournal.com/news/aberdeen-beef-plant-open-again-and-slaughtering-cattle/article_b0a76552-8f0b-11e5-aab0-4747ca2759bc.html (last visited May 9, 2019); Greg Henderson, "Kane Beef Now under Court Receivership," DROVERS (Oct. 16, 2018), www.drovers.com/article/kane-beef-now-under-court-receivership (last visited May 9, 2019).

[72] On information and belief, Packing Defendants' typical cut and kill costs per head – *i.e.*, the costs of slaughter and beef preparation – is between $160-$170 when their plant, or each shift at a plant, run at or near 40 hours per week.  That cost increases by approximately $20 per head if a plant runs at only 32 hours per week.

obtained from the field, including reports of their competitors' activities obtained from producers, back to their respective head offices and their firm's other field buyers through daily conference calls.

127.    These realities, combined with widespread formal and informal reporting of fed cattle and beef bids, transactions and volumes, and each slaughter plant's current and planned output, enable Packing Defendants to monitor each other's adherence to any anticompetitive agreement.  The purchasing dynamics of the fed cattle market, with its weekly cash trade, also provide Packing Defendants with the ability to punish any suspected non-compliance with such an agreement.[73]

## VIII.  PACKING DEFENDANTS ARE RECIDIVISTS WITH A HISTORY OF COLLUSION

128.    The conduct of Packing Defendants alleged herein is consistent with their previous use of production restraint to increase the price of other commodities such as broiler chicken and pork.  JBS and Tyson maintain significant market shares in both the broiler chicken and pork processing markets.  Cargill was the fourth largest U.S. pork processer until it sold its pork business to JBS in October 2015.

---

[73] Research shows that markets, such as the fed cattle market, in which a large number of sellers make repetitive sales to a small group of purchasers, facilitate the formation and maintenance of price-fixing agreements as they provide opportunities for the purchasers to agree, sustain and enforce market sharing arrangements.  Posner, R., ANTITRUST LAW 68 (Chicago, IL: University of Chicago Press, 2nd ed. 2001), at 68; and "Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For," U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION, www.justice.gov/atr/public/guidelines/211578.htm (last visited May 9, 2019).

129.    Broiler chicken and pork processors, including JBS and Tyson, are alleged to have engaged in a series of synchronized production cuts or restrictions designed to raise wholesale prices.  The broiler chicken processors are also said to have manipulated the "Georgia Dock" price benchmark – a self-reported benchmark commonly used by market participants to set wholesale chicken prices.

130.    In both cases, like here, the participants publicly called upon each other to maintain supply "discipline."[74]  Smithfield's CEO, Larry Pope, went as far as to confirm publicly in September 2009 that he had discussed pork production cuts with other "*sizable large producers*":

> The answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation. . .I think this industry has got to solve it collectively.  I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back. . .But the answer is, yes, there are others cutting back. We're not the only one.[75]

---

[74] For example, on May 3, 2013 JBS/Pilgrim's Pride CFO, Bill Lovettee said: "So I think the [broiler] industry is doing an admirable job in being disciplined on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying. . .I believe the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken."

[75] Event Brief of Q1 2010, Smithfield Earnings Conference Call (September 8, 2009).

131.    Government investigations[76] and civil litigation[77] regarding the processers' alleged conspiracies are ongoing.  At least one defendant, Fieldale Farms, opted to settle with plaintiffs in the broiler class claims.[78]

132.    In addition, Packing Defendants have a long history of other misconduct, spanning breaches of the Packers & Stockyards Act as well as antitrust, anti-corruption, environmental, health and safety regulation, both domestic and foreign.

## IX.    MANIPULATION OF LIVE CATTLE FUTURES AND OPTIONS

133.    Live cattle futures have traded on the CME since 1964. Live cattle options have traded on the CME since 1984.[79]  Both contracts, which are important tools used by producers to manage the risks associated with their businesses, were impacted by Packing Defendants' conspiracy.

---

[76] The Antitrust Section of the Florida Attorney General's office opened an investigation into the broiler chicken processors' alleged anticompetitive practices, and the Georgia Department of Agriculture has suspended the Georgia Dock price index.

[77] *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.) and *In re Pork Antitrust Litigation*, 18-cv-1776 (D. Minn).  The U.S. District Court for Northern District of Illinois held that the broiler chicken processors' customers had alleged sufficient facts to plausibly suggest that defendants' conduct was the product of a conspiracy.  *See In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d 772 (2017) ("Defendants' business strategies during the relevant time period are indicative of a conspiracy.").

[78] Order Granting Final Approval of Settlement with Defendant Fieldale Farms Corporation, *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.), Nov. 16, 2018, Docket # 1414.

[79] *Historical First Trade Dates*, CME, https://www.cmegroup.com/media-room/historical-first-trade-dates.html (last visited May 9, 2019).

A.    **Futures and Options Generally**

134.    A commodity futures contract is a standardized bilateral agreement for the purchase and sale of a particular commodity – such as fed cattle – at a specified time.  In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

135.    A futures contract typically involves two parties, with an exchange (in this case, the CME) acting as a central clearinghouse that guarantees both sides of the transaction, thereby eliminating counterparty risk.  The buyer of a futures contract is typically considered a "long," whose position will increase in value as the underlying physical or cash market price increases.  The seller of a futures contract is typically considered a "short" whose position will increase in value as the underlying physical or cash market price decreases.

136.    Rather than take delivery, futures market participants almost always "offset" their futures contracts prior to actual delivery.  For example, a purchaser of one live cattle futures contract may liquidate, cancel, or offset a future obligation to take delivery of the cattle by selling one live cattle futures contract.  The difference between the initial purchase price and the subsequent sale price represents the realized profit or loss for the trader.

137.    An options contract comes in two forms: a "call option" and a "put option." The buyer of a call option has the right (but not the obligation) to purchase the underlying asset at a set price (the "strike price").  The seller of the call option (sometimes called the "writer") has the obligation to deliver the underlying asset at the strike price if the buyer

exercises its right.  The buyer of a put option has the right (but not the obligation) to sell the underlying asset at a set price (the "strike" or "exercise" price).  The seller of a put option has the obligation to buy the underlying asset at the strike price if the buyer exercises its right.

## B.    Live Cattle Contracts

138.    When fed cattle have reached slaughter-weight, they are referred to as "live," "finished," or "fat" cattle.  They can be distinguished from "feeder cattle," which refers to fed cattle which weigh between 700-900 pounds and have yet to enter the feedlot.  Live cattle, for purposes of CME live cattle futures contracts, weigh no less than 1,050 pounds and no more than 1,550 pounds (or 1,350 pounds for heifers).

139.    Trading in CME live cattle futures and options is subject to the rules and regulations of the CME, including Chapter 101[80] (live cattle futures), Chapter 101A[81] (options on live cattle futures), and Chapter 101B[82] (options on live cattle futures calendar spreads) of the CME Rulebook.

140.    CME live cattle futures and options are traded electronically on CME's Globex electronic trading platform. While both live cattle futures and options were also traded in CME's "open outcry" trading pits at the beginning of the Class Period, only live

---

[80] CME Rulebook, CME, *available at* https://www.cmegroup.com/rulebook/CME/ ("CME Rulebook"), Chapter 101.

[81] CME Rulebook, Chapter 101A.

[82] CME Rulebook, Chapter 101B.

cattle options continued to be so traded after the CME's decision to close down most of its futures trading pits in July 2015.

### 1.    Live Cattle Futures

141.    Chapter 101 of the CME Rulebook sets forth the rules for trading in CME live cattle futures–including contract size, trade dates, and tick sizes–as well as deliveries on CME live cattle futures contracts, including, for example, weight deviations, location differentials, and delivery points.

142.    One live cattle futures contract calls for the delivery of 40,000 pounds of live cattle producing 65% Choice, 35% Select USDA grade of live steers or live heifers.[83]

143.    Live cattle futures prices are quoted in cents per pound.  The minimum tick size is $0.00025 per pound (or $10 per contract).[84]  A one penny ($0.01) change in the per pound price results in a $400 change in the contract price.

144.    Live cattle futures trade for the following contract months: February, April, June, August, October, and December.  Nine contract months are eligible for trading at any given time.  They include the six upcoming contract months and the next three contract months in the calendar cycle.[85] For example, in March 2019, the following contract months were eligible for trading: April 2019, June 2019, August 2019, October

---

[83] CME Rulebook, Chapter 101, Rules 10101, 10102.B.

[84] *Live Cattle Futures Contract Specs*, CME, *available at* https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_contract_ specifications.html.

[85] *Live Cattle Futures Quotes,* CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_quotes_globex.html.

2019, December 2019, February 2020, April 2020, June 2020, August 2020.  Trading continues until the last business day of the given contract month at 12:00 p.m.[86]

145.    Live cattle futures are "physically" settled.  This means the buyer of a live cattle future has a right to receive (and the seller of a live cattle future has the obligation to deliver) 40,000 pounds of cattle per contract.[87]

146.    Buyers may choose either live graded deliveries or carcass graded deliveries.[88]  Deliveries of live cattle are to be made at approved delivery points at approved livestock yards in the following territories: Colorado; Iowa / Minnesota / South Dakota; Kansas; Nebraska; Texas / Oklahoma / New Mexico.[89]  Buyers electing carcass graded delivery must specify an approved slaughter plant enumerated by the CME.  Eligible slaughter plants include those enumerated for the livestock yards to which the cattle were tendered, and any other approved slaughter plant that is within 225 road miles of the originating feedlot.

147.    A live delivery unit must consist entirely of steers or entirely of heifers.[90]  All cattle are required to be healthy,[91] and all cattle must be born and raised exclusively

---

[86] *Supra,* note 84.

[87] *Self-Study Guide to Hedging with Livestock Futures and Options*, CME, (Version 17), at    7,    https://www.cmegroup.com/trading/agricultural/files/AC-215_SelfStuy_Guide NYMEX.pdf (last visited May 9, 2019).

[88] CME Rulebook, Chapter 101, Rules 10103.B, 10103.C.

[89]  *Id.*, Rule 10103.B.

[90] *Id.*

[91] *Id.*

in the United States.[92]

### 2.    Live Cattle Options

148.    Chapter 101A of the CME Rulebook outlines the specifications for live cattle options.  The asset underlying a live cattle option is a live cattle futures contract.  A live cattle option permits the holder to buy, in the case of the call, or to sell, in the case of the put, one live cattle futures contract.  Live cattle options trade in cents per pound.  The minimum price fluctuation is $0.00025 per pound.[93]

149.    Live cattle options trade in the following contract months: February, April, June, August, October and December.[94]  At any given time, ten contract months trade, the six months in the February bi-monthly cycle, plus the three next in that cycle in the following year, as well as one nearby "serial" month of January, March, May, July, September, or November.[95]  Trading in live cattle options ends on the first Friday of the contract month at 1:00 p.m.[96]

150.    For monthly options that expire in the February bi-monthly cycle (*i.e.*, February, April, June, August, October, and December), the underlying futures contract is the futures contract for the month in which the option expires.  For example, the

---

[92] *Id.*, Rule 10101.

[93] *Live Cattle Options Contract Specs*, CME, https://www.cmegroup.com/trading/agricultural/livestock/live-cattle_contractSpecs_options.html .

[94] *Id.*

[95] *Id.*

[96] *Id.*

underlying futures contract for an option that expires in February is the February futures contract.[97]

151.    For monthly options that expire in months other than those in the February bi-monthly cycle (*i.e.*, January, March, May, July, September, and November), the underlying futures contract is the next futures contract in the February bi-monthly cycle that is nearest to the expiration of the option.   For example, the underlying futures contract for an option that expires in January is the February futures contract.

152.    Live cattle options are "American style," meaning that the option holders can exercise their options at any point prior to expiration of trading.[98]

153.    In addition, CME lists "live cattle calendar spread options," which trade pursuant to CME Rule 101B.  In the case of calendar spreads, the option is to buy (in the case of the call), or to sell (in the case of the put), one live cattle futures calendar spread.[99] A live cattle futures calendar spread option consists of a combination of a purchase in one futures contract month and a sale in another futures contract month.[100] Unlike American style options, these options can only be exercised on the day of expiration.[101]

---

[97] CME Rulebook, Chapter 101A, Rule 101A01.D.

[98] *Id.*, Rule 101A02.A.

[99] CME Rulebook, Chapter 101B, Rule 101B01.

[100] *Id.*

[101] *Id.*, Rule 101B02.

## C.    Relationship Between Live Cattle Futures and Cattle Spot (Cash) Prices

154.    There is a strong interplay between live cattle futures and the underlying fed cattle cash market.  As CME observes, "livestock cash prices and futures prices tend to move up and down together, which is what makes the concept of effective hedging possible."[102] "[F]utures prices [are] reflective of the main cash markets."[103]

155.    As the CME has recognized, livestock (including live cattle and feeder cattle) contract specifications are designed to ensure "a two-way relationship between the benchmark livestock futures market and the numerous livestock cash markets.  The price that is discovered in a futures market comes from the interaction between the supply (sellers' offers) and demand (buyers' bids)."[104] Many futures market "bids and offers come from cash market participants."[105]

156.    "In turn, the futures contract price is then used by cash market participants to transact in the spot (current) market or for cash forward type contracts."[106]  The relationship between the cash market and the futures market is particularly strong with

---

[102] *INTRODUCTION TO LIVESTOCK: Learn about Basis: Livestock,* CME, *available at* https://www.cmegroup.com/education/courses/introduction-to-livestock/learn-about-basis-livestock.html.

[103] *Self-Study Guide to Hedging with Livestock Futures and Options,* CME (2009 Version), at 9, *available at* http://www.kisfutures.com/CMELivestockSelfStudy.pdf.

[104] *Self-Study Guide to Hedging with Livestock Futures and Options*, CME (Version 17), at 6, *available at* https://www.cmegroup.com/trading/agricultural/files/AC-215_SelfStuy_GuideNYMEX.pdf.

[105] *Id.*

[106] *Id.*

---

respect to live cattle futures because, as the CME has observed, "many cash market contracts are 'based on' or 'referenced to' the futures market price."[107]

157.    Live cattle futures contracts are designed so that their prices converge with physical cash cattle prices when they expire.[108]   For physically settled contracts such as live cattle, "[t]he possibility of delivery on the futures contract generally causes the futures price during the delivery month to align with the cash price at the futures delivery locations."[109]

### D.    Packing Defendants Traded CME Live Cattle Futures and Options

158.    Packing Defendants interact regularly with the CME live cattle markets.

159.    During the period February 1, 2018 through January 31, 2019, for example, Packing Defendants had the only CME-approved slaughter plants for live cattle.[110] As a result, they are central participants in the CME live cattle market.

160.    In addition, Packing Defendants regularly trade live cattle futures and options.   Cargill touts its ability to effectively "manage risk" in live and feeder cattle futures and options contracts.   "Our risk management team has more than 20 years of experience helping customers manage price risks across 70-plus commodities markets"

---

[107]  *Id.*

[108]  *Supra* note 103.

[109]  *Id.* at 11.

[110]   CME Group, *Chicago Mercantile Exchange Inc. 2018 Approved Slaughter Plants for Live Cattle*, *available at* https://www.cmegroup.com/content/dam/cmegroup/ notices/market-regulation/2018/01/2018-approved-slaughter-plants-for-live-cattle.pdf.

including "Live cattle" and "Feeder cattle."[111]   News reports indicate that it trades actively in the cattle futures markets.  For example, on January 25, 2016, Cargill stated through a spokesperson, "We've seen not only a very volatile cattle futures market, but prices were coming down a lot."[112]

161.   Tyson uses "derivative financial instruments, primarily futures and options, to reduce our exposure to various market risks related to commodity purchases,"[113] as well as "to reduce the effect of changing prices and as a mechanism to procure the underlying commodity . . . ."[114]  "We hold certain positions, primarily in . . . livestock futures, that are not hedges for financial reporting purposes."[115]  "As part of our commodity risk management activities, we use derivative financial instruments, primarily futures and options, to reduce our exposure to various market risks related to these purchases . . . ."[116]

---

[111]   Cargill, *Agriculture   Risk   Management*, https://www.cargill.com/price-risk/crm/agriculture.

[112] Gregory Meyer, *Cattlemen lock horns with futures exchange over market volatility*, FINANCIAL TIMES (Jan. 25, 2016), https://www.ft.com/content/6eed1268-c130-11e5-846f-79b0e3d20eaf (last visited May 9, 2019).

[113] Tyson Foods, Inc., Quarterly Report (Form 10-Q) at 37 (February 4, 2011), *available at* https://www.sec.gov/Archives/edgar/data/100493/000119312511024082/d10q.htm.

[114] Tyson Foods, Inc., Annual Report (Form 10-K) at 8 (Sept. 29, 2018), *available at* https://s22.q4cdn.com/104708849/files/doc_financials/quartely/2018/q4/TSN-FY18-10-K.pdf.

[115] *Id.* at 14.

[116] *Id.* at 52.

162.     JBS references the CME live cattle futures contract in its procurement contracts.[117]  Its financial reports also indicate a high level of commodities, derivatives and futures trading.[118]  Marfrig likewise acknowledges that it trades "futures market derivative financial instruments" to "reduce commodity-related price risk."[119]  National Beef Packing similarly stated that it used "futures contracts in order to reduce exposure associated with entering into firm commitments to purchase live cattle at prices determined prior to the delivery of the cattle . . . ."[120]

163.     The specifics of Packing Defendants' CME cattle futures and options trading activity are not public information.  Trading on the CME is anonymous.  Packing Defendants do not publicly disclose their specific trading activity.  This information can only be obtained through discovery from Packing Defendants and third parties such as CME.

/ / /

/ / /

---

[117] *Driftless Region Beef Conference 2013*, Sample Contract, https://lib.dr.iastate.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1034&context=driftlessconference (last visited May 9, 2019).

[118] JBS S.A., Condensed Financial Statements and Independent auditors' report, at 46 (Sept. 30, 2018), https://jbss.infoinvest.com.br/enu/4812/DF%20JBS%20300918%20Ingls%20-%20Condensada%2013.11%2018h20_Parecer.pdf (last visited May 9, 2019).

[119] Marfrig Global Foods, 2017 Sustainability Report at 77, http://www.marfrig.com.br/Uploads/Arquivos/Marfrig_RA17_eng.pdf (last visited May 9, 2019).

[120] National Beef Packing Company, LLC, Annual Report (Form 10-K) at F-15, (November 16, 2011), *available at* https://www.sec.gov/Archives/edgar/data/1273784/000144530511003450/nbp201182710k.htm.

**E.    Packing Defendants Directly Caused CME Live Cattle Futures and Options Prices to Be Artificial**

164.    As explained above, Packing Defendants suppressed the price of fed cattle. Because slaughter-weight fed cattle is the commodity underlying CME live cattle futures and options, Defendants necessarily and directly caused prices of live cattle futures and options to be artificial.

165.    Packing Defendants had the motive to cause artificial depression of futures prices, separate and apart from their futures transactions.  In particular, futures prices are used to set the price of cattle delivered under forward contracts, as explained above.  As such, by depressing live cattle futures contracts Packing Defendants lower the cost of cattle procured under forward contracts.

166.    Packing Defendants' conduct in the cash cattle market had a direct and proximate impact on prices in the CME live cattle futures and options markets.  For example, on August 14, 2015, Tyson announced that it was closing its Denison, Iowa beef plant, which resulted in price declines in the cash and futures markets.  In particular, the spot or front-month August contract fell $0.004 per pound ($160 per live cattle future) and the October 2015 contract fell $0.01 per pound ($400 per live cattle future). According to one market participant, "[s]ome feedlots may have surrendered after seeing futures fall earlier in the session, partly on word that Tyson closed a beef plant."[121]

---

[121]  Theopolis Waters, *Livestock-CME live cattle futures sag with initial cash prices*, REUTERS, Aug. 14, 2015, https://www.reuters.com/article/markets-livestock-cattle/livestock-cme-live-cattle-futures-sag-with-initial-cash-prices-idUSL1N10P2MG20150814 (last visited May 9, 2019).

## X.     CLASS ACTION ALLEGATIONS

167.    Plaintiff brings this action on behalf of himself, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of all members of the following class:

> All persons who transacted in live cattle futures and/or options traded on the CME or another U.S. exchange during the Class Period. Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, and affiliates.[122]

168.    "Fed cattle" means steers and heifers, whether beef breeds or Holsteins, which are raised and fed specifically for beef production.  "Class Period" means the period from January 1, 2015 through the present.  "Cost-plus basis" means an agreement to sell fed cattle at a price determined by the producers' costs of production without regard to prevailing cash cattle prices.

169.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Members of the Class are readily identifiable from information and records in the possession of the CME, or capable of identification via third parties.

170.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants.

---

[122] The Class includes persons who established positions prior to the commencement of the Class Period but who closed out or stood for delivery on these positions after the Class Period commenced.  As noted below, Plaintiff reserves the right to amend the Class definitions as the litigation progresses to include, by way of example and not limitation, all persons who transacted in CME feeder cattle futures and options during the Class Period.

171.    Plaintiff will fairly and adequately protect and represent the interests of members of the Class.    The interests of Plaintiff are coincidental with, and not antagonistic to, those of members of the Class.    Plaintiff and all members of the Class are similarly affected by Defendants' course of conduct in violation of the Commodity Exchange Act.

172.    Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust, commodities manipulation and other complex litigation, including class actions in the financial services industry.

173.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making relief with respect to members of the Class as a whole appropriate.    Questions of law and fact common to members of the Class include, but are not limited to:

    a.    whether Packing Defendants engaged in a combination and conspiracy among themselves to fix, depress, suppress, and/or stabilize the prices of fed cattle purchased in the United States;

    b.    whether Packing Defendants engaged in a combination and conspiracy among themselves to allocate the market for the purchase of fed cattle offered for sale in the United States;

    c.    the identity of the participants of the alleged conspiracy;

    d.    the duration of the alleged conspiracy and the acts carried out by Packing Defendants in furtherance of the conspiracy;

e.    whether Packing Defendants' alleged conspiracy violated federal antitrust laws;

f.    whether Defendants' conduct violated Sections 6(c)(3), 9(a) and 22 of the Commodity Exchange Act;

g.    whether Defendants' conduct violated Sections 6(c)(1) and 22 of the Commodity Exchange Act;

h.    whether Defendants acted to aid and abet violations of the Commodity Exchange Act;

i.    whether John Doe Defendants' unlawful conduct caused cognizable legal injury under the Commodity Exchange Act;

j.    whether Plaintiff and members of the Class suffered injury;

k.    the amount of damages suffered by Plaintiff and members of the Class; and

l.    the appropriate type and scope of injunctive and related equitable relief.

174.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in

this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

175. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

176. Plaintiff has defined members of the Class based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the length of the Class Period.

## XI.    STATUTE OF LIMITATIONS AND TOLLING

177. The statutes of limitations governing Plaintiff's claims against Packing Defendants were tolled under the doctrine of fraudulent concealment. The doctrine applies here because Packing Defendants fraudulently concealed their misconduct through their own affirmative acts, and because Defendants' conduct was inherently self-concealing.

178. Packing Defendants actively concealed their violations of law from Plaintiff and the Class by, amongst other matters, (i) relying on non-public forms of communication; (ii) offering pre-textual justifications for their plant closures, slaughter reductions and withdrawal from the cash cattle trade; (iii) explicitly and implicitly representing that the fed cattle bids and contract terms Packing Defendants offered were the product of honest competition and not a conspiracy; and (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including

antitrust laws. Below is a list of non-exhaustive examples of such statements that each Packing Defendant published during the Class Period:

a.    Tyson's Code of Conduct extolled Tyson's compliance with antitrust laws throughout the Class Period. The Code's most recent iteration, from October 2018, reports that Tyson "compete[s] in the market with integrity and compl[ies] with competition laws . . . . We comply with the letter and spirit of competition laws . . . wherever we do business."

b.    JBS's 2014 Annual Report detailed the policies it had in place to "ensure ethical conduct and integrity in the management of its business," including its Manual of Ethical Conduct, which "addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices and other sensitive topics." JBS also launched an "Always Do The Right Thing" compliance program in July 2017.

c.    Cargill stressed in its 2015 Corporate Responsibility report that "[w]e obey the law. Obeying the law is the foundation on which our reputation and Guiding Principles are built . . . . We conduct our business with integrity . . . . We compete vigorously, but do so fairly and ethically. We . . . comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill reiterated this message in its subsequent Corporate Responsibility reports.

d.    National Beef Packing's former majority shareholder, Jeffries Financial Group, Inc. (formerly Leucadia National Corporation) noted in its 2014 Annual Report that National Beef was "subject to extensive government regulation" including by the USDA.

179.    Packing Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation.  Had the public learned that Packing Defendants conspired to fix prices in the fed cattle market, their conspiracy could not have continued for as long as it did.  Accordingly, Plaintiff could not have learned of Packing Defendants' anticompetitive conduct until recently.

180.    Because of Packing Defendants' fraudulent concealment, Plaintiff and the Class were not aware of Packing Defendants' misconduct and could not have discovered it through the exercise of due diligence until recently.  Plaintiff and members of the Class have acted diligently in seeking to bring their claims promptly.

181.    Accordingly, Plaintiff asserts that the applicable statutes of limitations on Plaintiff's claims were tolled.  Defendants are also equitably estopped from asserting any statute of limitations defense.

## XII.    CLAIMS FOR RELIEF

<div align="center">

**FIRST CLAIM FOR RELIEF**
**MARKET ALLOCATION AND PRICE-FIXING IN VIOLATION OF THE**
**SHERMAN ACT, 15 U.S.C. §1**
**(Alleged against all Packing Defendants)**

</div>

182.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

183.    During the Class Period, Packing Defendants controlled the slaughter of fed cattle in the United States and thus the available marketing outlets for fed cattle producers.    Packing Defendants were horizontal competitors in the market for the purchase of fed cattle.

184.    From at least January 1, 2015 and continuing to the present, the exact dates being unknown to Plaintiff, Packing Defendants engaged in a continuing agreement, understanding and conspiracy in an unreasonable and unlawful restraint of trade to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle.    This conduct had the effect of manipulating the prices of live cattle futures and/or option contracts traded on the CME.    This is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

185.    Packing Defendants' conspiracy and the resulting impact on fed cattle prices received by producers occurred in and affected U.S. interstate commerce.

186.    Because of Packing Defendants' combination, conspiracy or agreement, Plaintiff and the members of the Class transacted in live cattle futures and/or options traded on the CME at artificial prices during the Class Period.

187.    As a proximate result of Packing Defendants' unlawful conduct, Plaintiff and the Class have suffered injury to their business and property throughout the Class Period.    Plaintiff and members of the Class are entitled to treble damages for Packing Defendants' violations of the Sherman Act alleged herein.

/ / /

/ / /

## SECOND CLAIM FOR RELIEF
## UNJUST ENRICHMENT IN VIOLATION OF COMMON LAW
### (Alleged Against All Packing Defendants)

188.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

189.    Packing Defendants financially benefited from their unlawful acts, and it is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and the Class, and equity and good conscience require Packing Defendants to make restitution.

190.    Packing Defendants had the ability to cause artificial prices in fed cattle and live cattle futures and options.  They did so through, among other things, their dominant position in the market for the purchase of fed cattle, their superior access to information and reporting mechanisms, their financial wherewithal, and their extensive involvement in the CME live cattle futures and options trading and delivery processes.

191.    These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact in CME live cattle futures and options contracts at artificial prices.  These transactions were supposed to be priced based on competitive market forces and reflect honest competition by Packing Defendants.

192.    Commodity futures and other derivatives contract trading is a zero sum game.  To the extent that Packing Defendants benefited from their extensive unlawful acts, they necessary did so by forcing Plaintiff and members of the Class to lose.

193.    All traders enter the same standardized contract subject to the same rule set. This prominently includes rules and laws prohibiting manipulation.

194.    It would be inequitable for Packing Defendants to be permitted to violate that rule set and still retain the benefit that Packing Defendants obtained from such violation at the expense of Plaintiff and members of the Class.

195.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Packing Defendants from their unjust enrichment and inequitable conduct.

<div align="center">

**THIRD CLAIM FOR RELIEF**
**MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT**
**7 U.S.C. §§1, *ET SEQ.* AND CFTC REGULATION 180.2, CFTC REGULATION**
**180.2, 17 C.F.R. §180.2**
**(Alleged against all Packing Defendants and John Does 1-10)**

</div>

196.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

197.    During the Class Period, Packing Defendants, through their own conduct and through the conduct of John Does 1-10, specifically intended to manipulate the prices of fed cattle, the physical commodity underlying the CME live cattle futures and options contracts, and specifically intended to manipulate the prices of CME live cattle futures and options.

198.    Packing Defendants, through their own conduct and the conduct of John Does 1-10, had the ability to cause artificial prices in fed cattle and live cattle futures and options.  They did so through, among other things, their dominant position in the market for the purchase of fed cattle, their superior access to information and reporting mechanisms, their financial wherewithal, and their extensive involvement in the CME live cattle futures and options trading and delivery processes.

908551.1                                          70

199.    Packing Defendants, through their own conduct and the conduct of John Does 1-10, in fact caused artificial prices in the live cattle futures and options markets. Their conduct resulted in, among other things, artificially low prices in the commodity underlying CME live cattle futures and options prices and in the live cattle futures and options prices themselves.

200.    Packing Defendants and John Does 1-10 therefore engaged in unlawful manipulation of CME live cattle and futures and options and their underlying physical commodity in violation of Sections 6(c)(3), 7 U.S.C §9(3), 9(a) of the CEA, 7 U.S.C. §13(a), Section 22 of the CEA, 7 U.S.C. §25(a), and CFTC Rule 180.2, 17 C.F.R. §180.2.

201.    The manipulation by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Plaintiff and the Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

202.    Plaintiff and Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

**FOURTH CLAIM FOR RELIEF**
**MANIPULATIVE AND DECEPTIVE DEVICE**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1,** *ET*
***SEQ.* AND CFTC REGULATION 180.1(A), 17 C.F.R. §180.1(A)**
**(Alleged Against All Packing Defendants and John Does 1-10)**

203.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

/ / /

/ / /

908551.1                                    71

204.    Packing Defendants intended to affect or acted recklessly with regards to affecting prices of CME live cattle futures and options contracts and engaged in overt acts in furtherance of that intent.

205.    Packing Defendants intentionally or recklessly used or employed a manipulative device or artifice to defraud, and engaged in acts, practices, and/or courses of business which operated as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the CEA, 7 U.S.C. §9, and Section 22 of the CEA (7 U.S.C. §25), and Regulation 180.1(a), 17 C.F.R. §180.1(a).

206.    Packing Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

207.    The manipulative and deceptive devices employed by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Plaintiff and the Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

208.    Plaintiff and Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

**FIFTH CLAIM FOR RELIEF**
**PRINCIPAL-AGENT LIABILITY**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT,7 U.S.C. §§1, *ET***
***SEQ.* AND CFTC REGULATION 1.2, 17 C.F.R. §1.2**
**(Alleged Against All Packing Defendants and John Does 1-10)**

209.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

210.    Packing Defendants' traders, employees and/or officers, and conspirators, including John Does 1-10, acted as agents for their principals, Packing Defendants, when engaging in the manipulation and manipulative and deceptive devices and schemes described herein.

211.    Packing Defendants are liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B) and Regulation 1.2, 17 C.F.R. §1.2, for the manipulative acts of its agents, representatives, and/or other persons acting for them in the scope of their employment.

212.    The principal-agent violations by Packing Defendants and their conspirators and agents, including John Does 1-10, deprived Plaintiff and the Class of a lawfully operating market during the Class Period and caused them to transact at artificial prices which directly led to injury and economic damages.

213.    Plaintiff and Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. §§1, *ET SEQ.***
**(Alleged Against All Packing Defendants and John Does 1-10)**

</div>

214.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

215.    Packing Defendants and John Does 1-10 knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein, including violations by the other Packing Defendants and John Does 1-10.

216.    Packing Defendants and John Does 1-10 did so knowing of their violations of the CEA and willfully intended to assist these manipulations, which resulted in CME live cattle futures and options prices, and their underlying physical commodity becoming artificial, during the Class Period.

217.    Through their aiding and abetting violations, Packing Defendants and John Does 1-10 violated Section 22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

218.    Plaintiff and Class members are each entitled to actual damages and other relief from Packing Defendants and John Does 1-10.

## XIII.  PRAYER FOR RELIEF

219.    Plaintiff, on behalf of himself and members of the Class, requests relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a) & (b) of the Federal Rules of Civil Procedure, that the Plaintiff be named as a Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

C.    That the Court award Plaintiff and members of the Class damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.    That the Court issue appropriate injunctive and other equitable relief against Defendants;

E.     That the Court award Plaintiff pre- and post-judgment interest;

F.     That the Court award Plaintiff his costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts; and,

G.     That the Court award any and all such other relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury on all matters so triable.

Dated: May 9, 2019                    By:  */s/ Melissa S. Weiner*
                                      Melissa S. Weiner (Bar No. 0387900)
                                      Joseph C. Bourne (Bar No. 0389922)
                                      PEARSON, SIMON &
                                      WARSHAW, LLP
                                      800 LaSalle Avenue, Suite 2150
                                      Minneapolis, MN 55402
                                      Telephone: (612) 389-0600
                                      Email: mweiner@pswlaw.com
                                      jbourne@pswlaw.com

                                      Bruce L. Simon, *pro hac vice forthcoming*
                                      PEARSON, SIMON &
                                      WARSHAW, LLP
                                      44 Montgomery Street, Suite 2450
                                      San Francisco, CA 94104
                                      Telephone: (415) 433-9000
                                      Email: bsimon@pswlaw.com

                                      Daniel L. Warshaw, *pro hac vice forthcoming*
                                      Bobby Pouya, *pro hac vice forthcoming*
                                      Matthew A. Pearson, *pro hac vice forthcoming*
                                      PEARSON, SIMON &
                                      WARSHAW, LLP

15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Email: dwarshaw@pswlaw.com
bpouya@pswlaw.com
mapearson@pswlaw.com

David E. Kovel, *pro hac vice forthcoming*
Thomas W. Elrod, *pro hac vice forthcoming*
Karen Lerner, *pro hac vice forthcoming*
Anthony E. Maneiro, *pro hac vice forthcoming*
KIRBY McINERNEY LLP
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: (212) 371-6600
Email: dkovel@kmllp.com
telrod@kmllp.com
klerner@kmllp.com
amaneiro@kmllp.com

Brian Levin, *pro hac vice forthcoming*
LEVIN LAW, P.A.
2665 South Bayshore Drive, PH2B
Miami, Florida 33133
Telephone: (305) 539-0593
Email: brian@levinlawpa.com

*Counsel for Plaintiff Michael Sevy and the
Proposed Class*